**UNITED STATES of America,
Plaintiff,**

v.

**Alex MATÍAS–MAESTRES, Defendant.**

**Criminal No. 09–337 (FAB).**

United States District Court,
D. Puerto Rico.

Sept. 20, 2010.

Carmen M. Marquez–Marin, United States Attorneys Office, District of Puerto Rico, San Juan, PR, for Plaintiff.

## OPINION AND ORDER

BESOSA, District Judge.

Before the Court is the motion to suppress, (Docket No. 19), filed by defendant Alex Matías–Maestres ("defendant" or "Matías") and the report and recommendation, (Docket No. 29), concerning that motion. After making an independent examination of the record in this case and considering the arguments raised in the government's objection to the report and recommendation, the Court **ADOPTS** the magistrate judge's findings and recommendations as the opinion of the Court and **GRANTS IN PART AND DENIES IN PART** the motion to suppress.

## DISCUSSION

### I. BACKGROUND

#### A. Procedural Background

The indictment in this case charges Matías with one count of possession of a

firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). (Docket No. 1.) On April 5, 2010, defendant filed a motion to suppress evidence seized in the search of his person and the search of a vehicle in which he was a passenger. (Docket No. 19.) Both searches were conducted as a result of a traffic stop on July 24, 2009. *Id.* Defendant argues that the evidence was seized in violation of the Fourth Amendment, specifically that the searches were conducted without a warrant and do not fall under any of the exceptions to the general rule that warrantless searches are presumptively illegal. *Id.* On April 5, 2010, the Court referred the motion to suppress to United States Magistrate Judge Bruce McGiverin. (Docket No. 20.) On April 9, 2010, the government opposed the motion to suppress, arguing that: (1) defendant failed to comply with Federal Rule of Criminal Procedure 47 ("Rule 47") governing motions to suppress; and (2) the contested search of Matías's person was incident to a lawful arrest, thus making it valid despite the lack of a warrant. (Docket No. 22.)

On April 21, 2010, both parties presented evidence related to the motion to suppress at a hearing before Magistrate Judge McGiverin. (*See* Docket No. 26.) On May 1, 2010, the magistrate judge issued a report and recommendation, recommending that the motion to suppress be granted in part and denied in part.[1] (Docket No. 29.) On May 6, 2010, the government filed an objection to the report and recommendation, reiterating the arguments outlined in its opposition to the motion to suppress and voicing its disagreement with the Magistrate Judge's determination. (Docket No. 31.)

## B. Factual Background

Given that no party presents any legitimate objection to the findings of fact made by the magistrate judge, the Court adopts the following factual background presented in the report and recommendation:[2]

On the night of July 24, 2009, Officers Robles and Estrada were assigned to the Bayamon Traffic Division and were on preventive patrol in a marked patrol car on State Road 29. The car was equipped with a video recording system which was not operational at the time. At around 10:15 p.m., they pulled up to a red light behind a white Ford Ranger pickup truck with dark-tinted windows. Using the car's siren and speaker system, Robles instructed the driver to proceed through the intersection onto State Road 168 once the light turned green and then pull over. The driver complied and stopped in front of a church. The officers parked the patrol car in a "safety" position behind the pickup and got out. Robles went to the driver's side of the pickup, carrying an instrument to measure light transmittance through the tinted windows. Officer Estrada went to the pickup's other side, where a passen-

---

1. Defendant moves for the suppression of both a weapon seized during the search of his person and some drugs and drug paraphernalia seized during a later post-impoundment inventory search of the vehicle. (*See* Docket No. 29 at 6–17.) The magistrate judge recommends that the motion to suppress be granted with regard to weapon and denied with regard to the drugs and drug paraphernalia. *Id.* No party has filed objections to the magistrate judge's conclusion regarding the search of the vehicle. Accordingly, the Court will limit its analysis to the government's objec-

tions to the magistrate judge's determination that the search of Matías's person was invalid. *See Hernandez–Mejias v. General Elec.*, 428 F.Supp.2d 4, 6 (D.P.R.2005) (*citing Lacedra v. Donald W. Wyatt Detention Facility*, 334 F.Supp.2d 114, 125–126 (D.R.I.2004)).

2. Although the government requests a *de novo* hearing before the undersigned, it presents no specific objection to the factual findings of the magistrate judge or legitimate reason to question those findings. The government's request is addressed in more detail below.

ger, later identified as Matías, was seated. Estrada testified that he was providing support and security to Robles in accordance with standard police procedure.

Robles requested the driver's license and registration and said she had stopped him because the tint of the pickup's windows was too dark. Torres, the driver, produced the requested documents, which identified him as the owner of the pickup. Robles informed him that she was going to conduct a window tint test, showed him the window tint meter and explained its function, and said that Puerto Rico law required the window to have thirty-five percent or greater light transmittance. Robles conducted the test, and results came back at fifteen percent, meaning that the window tints were illegal. Robles told Torres the results and invited him to exit the vehicle and look at the meter to verify the results, but he declined. She told Torres he would be issued a ticket.

Robles also noticed that Torres's eyes were red and he smelled strongly of alcohol. Suspecting Torres of driving under the influence of alcohol ("DUI"), Robles read Torres the implied consent warning for DUI suspects and asked him if he understood it. He said yes and added that he felt all right and was giving his friend a ride home. Robles told Torres to get out of the vehicle. As Torres exited, Robles saw a beer bottle, its contents spilling on the driver's side floor mat. She mentioned this to Torres and told him that it was illegal to transport an open alcoholic beverage in a vehicle.

According to Robles, Puerto Rico regulations require that police wait twenty minutes before field-testing a driver for DUI, commencing at the time the officer begins the intervention. After Torres exited the vehicle and the prescribed period had elapsed, Robles administered a preliminary DUI field test for the driver's blood alcohol content ("BAC"), which showed

Torres exceeded the legal limit. Robles then informed Torres that he would be taken to the Bayamon Traffic Division police station for further DUI testing since the Intoxilyzer machine used for DUI testing at the station yields printed results which can be used as evidence. Robles testified that it is standard Transit Division police practice and that a DUI suspect must be transported in handcuffs in an official police vehicle with the officer who did the intervention. Accordingly, Robles told Torres she was going to handcuff him, did so, and told him she was going to pat him down. She raised Torres's untucked shirt and observed an ammunition magazine in his pants pocket, which she seized. Continuing the patdown, she discovered and seized a loaded Glock pistol from the front of Torres's pants, near his genital area. She asked him if he had a license to possess firearms and he shook his head no.

Meanwhile, Officer Estrada was keeping an eye on Matías for security and could see the patdown of Torres from his position at the passenger side of the car. Robles told Estrada that Torres was armed and instructed Estrada to arrest Matías because Torres had no license to carry weapons. Estrada then ordered Matías out of the car and read him the Miranda warnings from a card issued by the Puerto Rico Police Department because, he testified, the weapon that had been seized from Torres was not legal. He then handcuffed Matías and told him, "I'm going to pat you down for my safety as well as yours." After handcuffing Matías, Estrada raised the back of Matías's shirt and seized a loaded black pistol he found at Matías's back. Estrada told Robles that Matías was armed. As soon as Estrada seized the weapon, he asked Matías if he was under any death threat, because both men were armed, and Matías told Estrada he had no license for the pistol and that he was on probation for murder.

Robles put Torres in the patrol car and called for backup. The shift sergeant arrived a few minutes later. The officers told him what had happened and showed him the two guns. The group departed for the Transit Division station house sometime after 10:35 p.m. Robles transported Torres in her patrol car, the shift sergeant transported Matías in his patrol car, and Estrada drove Torres's pickup truck. It took approximately five to seven minutes to transport the two men to the station, and about thirteen or fourteen minutes elapsed between the officers' call for backup and their arrival at the station.[3]

## II. Legal Analysis

### A. Standard under 28 U.S.C. § 636(b)(1)

A district court may refer, *inter alia*, "a motion ... to suppress evidence in a criminal case" to a magistrate judge for report and recommendation. *See* 28 U.S.C. § 636(b)(1)(A)-(B); Fed.R.Civ.P. 72(b); Loc. Rule 72(a). Any party adversely affected by the report and recommendation may file written objections within fourteen days of being served with the magistrate judge's report. *See* 28 U.S.C. § 636(b)(1). A party that files a timely objection is entitled to a *de novo* determination of "those portions of the report or specified proposed findings or recommendations to which specific objection is made." *Sylva v. Culebra Dive Shop*, 389 F.Supp.2d 189, 191–92 (D.P.R.2005) (citing *United States v. Raddatz*, 447 U.S. 667, 673, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980)). Failure to comply with this rule precludes further review. *See Davet v. Maccarone*, 973 F.2d 22, 30–31 (1st Cir.1992). In conducting its review, the court is free to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(a)(b)(1). *Templeman v. Chris Craft Corp.*, 770 F.2d 245, 247 (1st Cir.1985); *Alamo Rodriguez v. Pfizer Pharmaceuticals, Inc.*, 286 F.Supp.2d 144, 146 (D.P.R.2003). Furthermore, the Court may accept those parts of the report and recommendation to which the parties do not object. *See Hernandez–Mejias*, 428 F.Supp.2d at 6 (citing *Lacedra*, 334 F.Supp.2d at 125–126).

### B. Request for a *De Novo* Hearing

The government requests a *de novo* hearing "to demonstrate that the traffic violations committed by the driver of the pick up truck, were enough to support the legal detention of the vehicle that led to the legal arrest and search of both the driver and the passenger." (Docket No. 31.) The government does not, however, elucidate any specific reasons why a *de novo* hearing would be necessary to resolve the motion to suppress properly. Without particular objections to the magistrate judge's factual findings, the Court is left without any basis to overturn those findings and order a *de novo* hearing.

Furthermore, the government's generalized request is undermined by the clear credibility determinations in favor of the government's witnesses expressed by the magistrate judge. The report and recommendation states, "[g]iven ... that the officers' version is consistent, I find the officers' testimony to be more reliable." In light of the government's failure to justify a *de novo* hearing and the magistrate judge's express adoption of the government witnesses' testimony, the govern-

---

**3.** Because no party objects to the magistrate judge's findings regarding the search of the vehicle, the portions of the factual background relating to that search have been omitted. Also omitted is the magistrate judge's summary of the testimony of the defendant's witness, Torres, which the magistrate judge ultimately determined to be unreliable. (*See* Docket No. 29 at 5.)

ment's request for a *de novo* hearing is **DENIED.**

### C. Absence of a Supporting Affidavit

The government argues that the motion to suppress, (Docket No. 19), should be denied because it was not accompanied by a supporting affidavit. (Docket No. 31 at 2.) The government incorrectly claims that such an affidavit is necessary to file a motion to suppress properly. *Id.* The government originally raised this issue in its opposition to the motion to suppress, but the magistrate judge did not address it in the report and recommendation.

Rule 47 states that "[a] motion **may** be supported by affidavit." Fed.R.Crim.P. 47(b) (emphasis added). Rule 47 does not require a supporting affidavit, but rather allows one to be filed with a motion to suppress. *See id.* The passage relied upon by the government, Rule 47(d), refers to service of an affidavit if one is submitted in conjunction with a motion to suppress. *See* Fed.R.Crim.P. 47(d); (Docket No. 31 at 2–3.) Therefore, the government's first objection to the report and recommendation is groundless.[4]

### D. Search Incident to a Lawful Arrest

■ The government objects to the magistrate judge's treatment of its primary argument that the search of Matías's person constituted a search incident to a lawful arrest. The magistrate judge determined that, at the time Matías was detained and searched, there were no facts giving rise to the requisite probable cause to arrest Matías. (Docket No. 29 at 9–10.) Having made that determination, the magistrate judge concluded that Matías's arrest could not support a lawful incidental search. *Id.* at 10.

■ The Fourth Amendment proscribes violations of "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A search incident to a lawful arrest is one of the few exceptions to the general rule that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

■ If an arrest is made without a warrant, as in this case, that arrest must be supported by probable cause. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001); *Holder v. Town of Sandown*, 585 F.3d 500, 504 (1st Cir.2009). "A police officer has probable cause when, at the time of the arrest, the 'facts and circumstances within the officer's knowledge ... are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Holder*, 585 F.3d at 504 (citing *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979); *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *Acosta v. Ames Dep't Stores*, 386 F.3d 5, 9 (1st Cir.2004); *Rivera v. Murphy*, 979 F.2d 259, 263 (1st Cir.1992); *United States v. Figueroa*, 818 F.2d 1020, 1023 (1st Cir. 1987)).

To make the probable cause determination, the Court "must view the circum-

---

**4.** The government also cites to case law regarding the showing a defendant must make to be entitled to a hearing on a motion to suppress. (*See* Docket No. 31 at 3.) The government has waited far too long to make any such argument. Any objection to defendant's entitlement to a hearing should have been presented prior to the hearing that took place on April 21, 2010.

stances from the perspective of a reasonable person in the position of the officer." *Id.* (citing *Roche v. John Hancock Mut. Life Ins. Co.,* 81 F.3d 249, 255 (1st Cir. 1996); *Wilson v. Russo,* 212 F.3d 781, 789 (3d Cir.2000)). In lieu of tailoring its objections to the magistrate judge's specific conclusions, the government submits, aside from three paragraphs of additional boilerplate language, the exact same legal analysis presented in their opposition to the motion to suppress. (*See* Docket Nos. 22 & 31.) As such, it continues to suffer from the same defects noted in the report and recommendation.[5] (Docket No. 29 at 8–14.) The arguments contained in the Government's opposition lack clarity, organization, and a firm grasp on the factual background established in this case.

The government attempts to argue that "the arresting officers had more than sufficient facts[ ] to establish probable cause to believe that the defendants were committing a firearms offense." (Docket No. 31 at 9.) Aside from serving as an example of the government's tendency to blur the identities of Torres and Matías, this argument fails when applied specifically to Matías. The only fact that connects Matías to a firearms-related offense, i.e., Officer Estrada's discovery of a handgun, resulted from the search challenged by the motion to suppress. It has long been settled that "an arrest is not justified by what the subsequent search discloses." *See Henry v. United States,* 361 U.S. 98, 104, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). Therefore, the government must point to some additional circumstances that would create sufficient probable cause to justify Matías's arrest prior to the challenged search.

The government's attempt to identify facts that justify Matías's arrest consistently confuses the identity of Matías with that of Torres, the actual driver of the pickup truck involved in the traffic stop. (*See* Docket No. 31.) This includes repeatedly attributing Torres's actions to Matías, stating, among other things, that Matías was driving the vehicle stopped by the arresting officers and that he, instead of Torres, was ordered to stop the truck and provide his driver's license.[6] *See id.* Ultimately, the government fails to highlight sufficient facts in the record to support a reasonable belief, at the time of the search, that Matías was involved in criminal activity. While there appears to be no lack of evidence establishing probable cause for Torres's arrest, that evidence, without more, does not create the requisite probable cause for Matías's arrest.

The record is devoid of any facts that independently support a finding of probable cause to arrest Matías and conduct the search that revealed a handgun concealed under Matías's shirt. For the most part, the government attempts to rest a finding of probable cause to arrest Matías on Torres's conduct. Given the lack of any evidence specific to Matías, other than his presence in Torres's vehicle, the Court agrees with the magistrate judge's finding that "there was no basis for a prudent person to think that Matías had done anything wrong, aside from his ill-starred choice to accept a ride home from Torres." (Docket No. 29 at 10.) Having concluded that the underlying arrest was unlawful, it cannot provide the basis for any valid incidental search.

---

**5.** The magistrate judge specifically cited to instances where the government mistakenly imputed the actions of Torres to Matías and aptly characterized the government's opposition as being "no model of clarity." (Docket No. 29 at 8.)

**6.** The government also refers to Matías and Torres as "defendants" on numerous occasions, and on one occasion, specifically labels Torres as a defendant. (*See* Docket No. 31.) It is clear from the indictment that Matías is the only defendant in this case. (*See* Docket No. 1.)

### E. Protective Frisk

■ Although the government's primary argument seeks to characterize the search of Matías's person as a search incident to a lawful arrest, the magistrate judge addressed the contingency that the discovery of the weapon was the result of a protective frisk in light of brief references to a "security sweep" or "protective frisk" in the government's opposition. (*See* Docket No. 29 at 8; Docket No. 22; Docket No. 31.) The magistrate judge concluded that, even under the rubric of a protective frisk, Officer Estrada's search of Matías failed to comply with the Fourth Amendment. (Docket No. 29 at 15.) As the legal analysis in the government's opposition to the motion to compel and its objections to the report and recommendation are, for the most part, one and the same, the Court will also consider whether the search of Matías could potentially constitute a valid protective frisk. (*See* Docket Nos. 22 & 31.)

■ The protections of the Fourth Amendment "extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Soares*, 521 F.3d 117, 120 (1st Cir.2008) (citing *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)). Courts cannot, however, ignore " 'the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest.' " *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). The First Circuit Court of Appeals has held that "[a] pat-frisk of a passenger in a car that is stopped for a traffic violation is one of those situations."[7] *Id.*

■ "To justify a patdown of the driver or passenger during a traffic stop, however, ... the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Chaney*, 584 F.3d at 24–25 (citing *Arizona v. Johnson*, — U.S. —, 129 S.Ct. 781, 788, 172 L.Ed.2d 694 (2009)); *Soares*, 521 F.3d at 120. "Reasonable suspicion is evaluated based on 'the totality of the circumstances and it demands a practical, commonsense approach.' " *Soares*, 521 F.3d at 120–121 (quoting *United States v. Jones*, 432 F.3d 34, 40 (1st Cir.2005)). The Supreme Court has held that a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. *Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). The First Circuit Court of Appeals has followed this principle in the context of protective frisks, consistently applying a "totality of the circumstances" test in that particular application of the Fourth Amendment. *See, e.g., Soares*, 521 F.3d at 120–22.[8]

Other courts have refused to "rely on a generalized risk to officer safety to justify a routine 'pat-down' of all passengers as a matter of course." *See United States v. Sakyi*, 160 F.3d 164, 168–69 (4th Cir.1998); *United States v. Starks*, 301 F.Supp.2d 76,

7. The magistrate judge concluded that the traffic stop giving rise to this case was valid and supported by probable cause. (Docket No. 29 at 6–7.) Neither party objects to this finding.

8. The magistrate judge briefly discusses other circuits' adoption or rejection of the "automatic companion" rule, which allows a protective frisk of any passengers accompanying a driver who has been arrested. (*See* Docket No. 29 at 12–13.) The government does not cite to any case relying on that rule, nor does it argue for its application here. (*See* Docket No. 31.) The clear, recent affirmation of the "totality of the circumstances" test in circumstances substantially similar to those presented in this case further obviates any detailed consideration of the "automatic companion" rule. *See Soares*, 521 F.3d at 120–22.

86 (D.Mass.2004). In order to justify the search of Matías as a protective frisk, the government must point to facts that would create an individualized reasonable suspicion necessary to frisk Matías. *See Chaney,* 584 F.3d at 26–27 (finding reasonable suspicion where officer observed bulge in passenger's pocket and acted evasively when questioned about his pocket); *Soares,* 521 F.3d at 120–22 (finding reasonable suspicion to frisk an agitated, uncooperative passenger where traffic stop occurred in a high-crime area and passenger twice moved his hands to an out-of-sight area of the vehicle).

The government has failed to point to any fact other than Matías's presence in the car driven by Torres. (*See* Docket No. 31.) There is no indication in the factual record that the traffic stop of Torres's vehicle occurred in a high-crime area, that Matías engaged in any strange or uncooperative behavior during the traffic stop, that Matías was wearing or in possession of any object or article of clothing that could be indicative of criminal activity, or that Torres engaged in any conduct that would cause Officers Robles and Estrada to believe reasonably that Torres and Matías were involved in any common criminal enterprise. (See Docket No. 29 at 1–3.) In view of the absence of any facts pertaining Matías behavior, location, or appearance, the government cannot establish the reasonable suspicion required to justify the search of Matías's person as a valid protective frisk under the Fourth Amendment.[9]

### III. Conclusion

The Court has considered the government's objections and made an indepen-

dent examination of the record in this case and **ADOPTS** the magistrate judge's findings and recommendations as the opinion of the Court. The government's request for a *de novo* hearing is **DENIED.**

Accordingly, defendants' motion to suppress, (Docket 19), is **GRANTED IN PART AND DENIED IN PART.** The motion to suppress is granted with regard to the evidence seized as a result of the unlawful search of Matías person. The motion to suppress is denied with regard to the evidence seized as a result of the subsequent search of Torres's vehicle.

**IT IS SO ORDERED.**

### *REPORT AND RECOMMENDATION*

BRUCE J. McGIVERIN, United States Magistrate Judge.

Defendant Alex Matías–Maestres ("Matías" or "defendant") is charged with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). (Docket No. 1). Before the court is defendant's motion to suppress evidence obtained in searches resulting from a traffic stop on July 24, 2009. (Docket No. 19). The government has opposed. (Docket No. 22). Defendant's motion was referred to me for report and recommendation pursuant to 28 U.S.C. § 636(b)(1). (Docket No. 20). An evidentiary hearing was held on April 21, 2010. For the reasons that follow, I recommend that the motion to suppress be granted in part and denied in part.

### FACTUAL BACKGROUND

During the hearing, the court heard testimony from three witnesses: (1) Puerto

---

**9.** The magistrate judge also noted that, according the factual background established at the hearing, it appears that Officer Estrada lifted Matías's shirt prior to any protective frisk, thus constituting a more invasive intrusion than a simple protective frisk. Having already found that the Officer Estrada lacked probable cause to conduct a protective frisk, it follows that he would likewise lack probable cause for a greater intrusion. Thus, the Court need not consider the possibility that intrusion separately to resolve the motion to suppress.

Rico Police Officer Elizabeth Robles–Monroig ("Robles"), (2) Puerto Rico Police Officer Waldemar Estrada–Colon ("Estrada"), and (3) Rafael Torres–Cespedes ("Torres"). The following facts, which the court finds credible, are derived largely from the testimony of the two police officers.

On the night of July 24, 2009, Officers Robles and Estrada were assigned to the Bayamón Traffic Division and were on preventive patrol in a marked patrol car on Road 29. The car was equipped with a video recording system, but it was not operational at the time. At around 10:15 p.m., they pulled up to a red light behind a white Ford Ranger pickup truck with dark-tinted windows. Using the car's siren and speaker system, Robles instructed the driver to proceed through the intersection onto Road 168 once the light turned green and then pull over. The driver complied and stopped in front of a church. The officers parked the patrol car in a "safety" position behind the pickup and got out. Robles went to the driver's side of the pickup, carrying an instrument to measure light transmittance through tinted windows. Officer Estrada went to the pickup's other side, where a passenger, later identified as Matías, was seated. Estrada testified that he was providing support and security to Robles in accordance with standard police procedure.

Robles requested the driver's license and registration and said she had stopped him because the tint of the pickup's windows was too dark. Torres, the driver, produced the requested documents, which identified him as the owner of the pickup. Robles informed him that she was going to conduct a window tint test, showed him the window tint meter and explained its function, and said that Puerto Rico law required the window to have thirty-five percent or greater light transmittance. Robles conducted the test, and the results came back at fifteen percent, meaning the window tints were illegal. Robles told Torres the results and invited him to exit the vehicle and look at the meter to verify the results, but he declined. She told Torres he would be issued a ticket.

Robles also noticed that Torres's eyes were red and he smelled strongly of alcohol. Suspecting Torres of driving under the influence of alcohol ("DUI"), Robles read Torres the implied consent warning for DUI suspects and asked him if he understood it. He said yes and added that he felt all right and was giving his friend a ride home. Robles told Torres to get out of the vehicle. As Torres exited, Robles saw a beer bottle in the truck, its contents spilling on the driver's side floor mat. She mentioned this to Torres and told him that it was illegal to transport an open alcoholic beverage in a vehicle.

According to Robles, Puerto Rico regulations require that police wait twenty minutes before field-testing a driver for DUI, commencing at the time the officer begins the intervention. After Torres exited the vehicle and the prescribed period had elapsed, Robles administered a preliminary DUI field test for the driver's blood alcohol content ("BAC"), which showed Torres exceeded the legal limit. Robles then informed Torres that he would be taken to the Bayamón Traffic Division police station for further DUI testing since the Intoxilyzer machine used for DUI testing at the station yields printed results which can be used as evidence. Robles testified that it is standard Transit Division police practice to transport a DUI suspect to the police station for further testing pursuant to the results of a field test, and that a DUI suspect must be transported in handcuffs in an official police vehicle with the officer who did the intervention. Accordingly, Robles told Torres she was going to handcuff him, did so, and told him she was going to pat him

down. She raised Torres's untucked shirt and observed an ammunition magazine in his pants pocket, which she seized. Continuing the patdown, she discovered and seized a loaded Glock pistol from the front of Torres's pants, near his genital area. She asked him if he had a license to possess firearms and he shook his head no.

Meanwhile, Officer Estrada was keeping an eye on Matías for security and could see the patdown of Torres from his position at the passenger side of the car. Robles told Estrada that Torres was armed and instructed Estrada to arrest Matías because Torres had no license to carry weapons. Estrada then ordered Matías out of the car and read him the *Miranda* warnings from a card issued by the Puerto Rico Police Department because, he testified, the weapon that had been seized from Torres was not legal. He then handcuffed Matías and told him, "I'm going to pat you down for my safety as well as yours." After handcuffing Matías, Estrada raised the back of Matías's shirt and seized a loaded black pistol he found at Matías's back.[1] Estrada told Robles that Matías was armed. As soon as Estrada seized the weapon, he asked Matías if he was under any death threat, because both men were armed, and Matías told Estrada he had no license for the pistol and that he was on probation for murder.

Robles put Torres in the patrol car and called for backup. The shift sergeant arrived a few minutes later. The officers told him what had happened and showed him the two guns. The group departed for the Transit Division station house sometime after 10:35 p.m. Robles transported Torres in her patrol car, the shift sergeant transported Matías in his patrol car, and

Estrada drove Torres's pickup. It took approximately five to seven minutes to transport the two men to the station, and about thirteen or fourteen minutes elapsed between the officers' call for backup and their arrival at the station.

At the police station, Torres and Matías were taken to an interview room where Torres was given the Intoxilyzer test. Robles issued two tickets to Torres, one for the window tint violation and one for the open container violation. Both men were interviewed and their general information was taken down. Their personal items were seized and inventoried, and they were issued inventory receipts. Each man was carrying large amounts of money and two cellular phones. Robles issued the men *Miranda* warning forms, which they signed. Estrada was also present at the time. In addition to the *Miranda* warning form, Torres signed the implied consent warning form given to DUI suspects.

Matías was placed in the cell area while Torres accompanied Robles and Estrada for an inventory search of his vehicle. During the inventory search, Estrada moved the pickup's passenger seat forward, revealing a gray bag and a red bag with a picture of Mickey Mouse on it. The gray bag contained a clear pressure-seal plastic bag holding approximately one pound of what appeared to be marijuana. The red bag contained a white bag, a white container labeled "lactose", a medium-size clear bag containing a small spoon and a large number of empty small clear baggies, and a medium-size plastic bag containing five small clear pressure-seal baggies with a white powder substance that appeared to be cocaine. Torres stood one

---

1. While the government maintains in its opposition to the motion to suppress that Officer Estrada "detained" Matías, "conducted a security sweep," found the pistol, and then Mirandized him (Docket No. 22, p. 2–3), Officer

Estrada's testimony was clear: he Mirandized Matías, then handcuffed him, then told him he would pat him down, then lifted his shirt and found the gun.

or two feet away from the vehicle during the inventory search, close enough that he could observe the search being conducted.

When the search concluded, the officers issued Torres a receipt for the search and called Technical Services to photograph the seized substances. Next, the officers went to the Drug Division with both suspects in order to test the seized substances. The officer who did a field test of the substance in the five baggies informed Robles and Estrada that the substance did not conclusively test positive for cocaine. The Drug Division sent the substance to the police laboratory for chemical analysis. The results, which were sent to the district attorney's office in Bayamón but not to the arresting officers, showed that the substance was not cocaine. The day after the arrests, July 25, 2009, and before Officer Robles knew the results of the chemical analysis, criminal charges were filed against Matías in the local court in Bayamón. The charges were dismissed upon the filing· of the instant case in this court.[2]

To be clear, Torres, who has been indicted in another case arising out of the same incident (*see* Cr. No. 09–336(JAF)), testified as to a much different version of the events recited above. According to Torres, the officers followed his truck as he and Matías left a bar, pulled him over, asked whether he was drunk, then pulled both men out of the vehicle, arrested them, and took them to the station, without conducting any on-site window tint test, field sobriety test, or weapons searches. Torres stated that the guns were found in the car during the vehicle search at the station. However, Torres's testimony was impeached when on cross-examination he admitted that he signed a plea agreement containing a statement of facts which was largely consistent with the officers' version, and that during a hearing to change his plea to guilty he affirmed that statement of facts while under oath and stated that he understood it. *See* Fed. R. Evid. 613 (impeachment by witness's prior statements). Torres has since filed a motion to withdraw his guilty plea which is still under consideration. (Cr. No. 09–336, Docket No. 35). At the suppression hearing in the case at bar, he stated that he had not actually understood the statement of facts he signed. Given the fact that Torres has provided two different versions of the events, and that the officers' version is consistent, I find the officers' testimony to be more reliable.

## LEGAL DISCUSSION

Matías seeks to suppress evidence obtained from the search of Torres's vehicle at the police station. He maintains that the firearm he is charged with possessing and the other firearm recovered by police were not seized at the time of the two men's arrest, but rather that the guns and all other evidence were seized later during the vehicle search. He argues that his arrest was illegal for lack of probable cause and that the vehicle search was illegal for lack of reasonable suspicion, probable cause, or either arrestee's consent. (Docket No. 19, p. 3, 8, 10). Because I credit the officers' testimony that they seized firearms from Torres and Matías during the traffic stop, I will analyze the

---

2. On July 25, 2009, Officer Robles prepared a sworn statement which Commonwealth prosecutors used in preparing the local court complaint. Officer Robles testified that her sworn statement said the five baggies seized contained "what appeared to be cocaine." However, the complaint stated that the field test results were positive for cocaine. Officer Robles testified that she read and signed the complaint, per standard practice, on the day it was filed. While it is troubling that Officer Robles signed a complaint that misstated the results of the field test, I do not find that it impeaches the credibility of her testimony, which was corroborated by Officer Estrada.

search of Matías's person and the search of Torres's vehicle in turn.

## A. Search of Defendant During Traffic Stop

### 1. The initial stop and Torres's arrest

■ Matías first contends that the stop of Torres's vehicle was illegal from its inception. (Docket No. 19, p. 8–9). The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The temporary detention of individuals by police during an automobile stop constitutes a "seizure" of "persons" within the meaning of the Fourth Amendment, and thus the stop must not be "unreasonable" under the circumstances. Generally, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred. *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). The constitutional reasonableness of a traffic stop does not depend on the actual, subjective motivations of the individual officers involved. *Whren*, 517 U.S. at 813, 116 S.Ct. 1769; *United States v. Robinson*, 414 U.S. 218, 221 n. 1, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

When police officers effect an investigatory stop of a vehicle, all of the vehicle's occupants, not just the driver, are subjected to a seizure under the Fourth Amendment. *Brendlin v. California*, 551 U.S. 249, 256–57, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007); *United States v. Kimball*, 25 F.3d 1, 5 (1st Cir.1994). A vehicle passenger has standing to challenge an investigatory stop of the vehicle because the passenger's own interests are affected. *Brendlin*, 551 U.S. at 259, 127 S.Ct. 2400; *Kimball*, 25 F.3d at 5. Thus, if the initial stop of the vehicle was illegal, evidence seized by virtue of that stop may be sub-

ject to exclusion as the "fruit of the poisonous tree." *Kimball*, 25 F.3d at 5–6 (citing *Wong Sun v. United States*, 371 U.S. 471, 484–85, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).

■ Matías contends that the automobile stop was a mere pretext for an ulterior motive and thus illegal. However, the officers' observation of the dark tint of the Ford Ranger's windows gave them probable cause to pull over the vehicle in order to investigate a possible violation of Puerto Rico traffic law. Thus, any ulterior motive of the officers for stopping the pickup is irrelevant to the stop's constitutionality. *Whren*, 517 U.S. at 813, 116 S.Ct. 1769.

Matías next argues that the police officers had no reasonable suspicion or probable cause to arrest Torres during the vehicle stop, so the evidence found in the subsequent search of Torres's vehicle must be excluded as the fruits of an illegal arrest. (Docket No. 19, p. 8). An investigatory search and seizure complies with the Fourth Amendment where officers' actions were (1) justified at their inception and (2) reasonably related in scope to the circumstances which justified the officers' initial interference. *United States v. McCarthy*, 77 F.3d 522, 530 (1996); *Terry v. Ohio*, 392 U.S. 1, 19–20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Importantly, an officer may gradually shift her focus and increase the scope of her investigation if her suspicions mount during the course of the detention. *United States v. Chhien*, 266 F.3d 1, 6 (1st Cir. 2001).

As discussed, the stop was justified at its inception by the officers' belief that the pickup's window tints were illegal. During the stop, Robles quickly confirmed these suspicions by conducting the light transmittance test while Estrada, following standard police practice, stood by to provide support and security. Robles was preparing to issue Torres a ticket when she noticed several signs that made her

suspect him of DUI. She prolonged the stop only as long as necessary to comply with the prescribed twenty-minute waiting period before giving Torres a field sobriety test, whose results provided probable cause to arrest him. Less than half an hour elapsed between the initial stop and Torres's arrest. Robles explained the reasons for her actions to Torres throughout the encounter, advised him of his rights, and did not restrain him until she was handcuffing him during his arrest. There is no credible evidence that the police actions leading up to Torres's arrest were anything but prompt, diligent, and by-the-book. In short, nothing about the stop undermines the legality of Torres's arrest. As the initial stop of Torres's vehicle and his arrest were both valid, suppression is unwarranted on this ground.

### 2. The search of Matías's person

While Torres's lawful arrest by Robles justified her contemporaneous search of his person and seizure of an unlicensed handgun and ammunition magazine, the search of Matías, which uncovered the handgun giving rise to the charged offense, presents a more difficult question. Matías argues that his arrest was illegal for lack of probable cause or reasonable suspicion. The government, in response, filed an opposition brief which is no model of clarity and which repeatedly attributes Torres's actions to Matías. (*See e.g.*, Docket No. 22, p. 4 ("law enforcement agents ordered the defendant to stopped [sic] his pick up truck, to produce his drivers license and the registration of his

vehicle"), p. 6 ("once the defendant committed the traffic violations the agents had enough probable cause to make a legal stop of the vehicle and arrest the defendant.")). Nevertheless, the government's primary argument is that the gun found on Matías was uncovered as the result of a search incident to his lawful arrest. (Docket No. 22, p. 4–8). In its statement of facts, however, the government characterizes the search as a "security sweep" by Estrada *before* he Mirandized Matías. (*Id.*, p. 3). As discussed below, I conclude that no matter how this search is characterized, it was not lawful under the Fourth Amendment, so the handgun found on Matías should be suppressed.

### a. Search incident to Matías's lawful arrest

Generally, searches conducted outside the judicial process, without a judge's prior approval, are per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). One such exception is a search incident to a lawful arrest. This exception derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations. *See Chimel v. California*, 395 U.S. 752, 762–63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). A search incident to arrest may include only the arrestee's person and the area within his immediate control, that is, the area from within which he might gain possession of a weapon or destructible evidence. *Id.* at 763.[3]

---

**3.** I note that the government's brief does not claim that the weapon found on Matías was uncovered as part of a search incident to the lawful arrest of *Torres*. Indeed, the search of Matías cannot be justified as a search incident to Torres's arrest because Torres was outside of the pickup while Matías was still in the passenger seat, well out of Torres's reach, and the police could not reasonably have believed

that evidence of Torres's DUI might be found on Matías. *Chimel*, 395 U.S. at 763, 89 S.Ct. 2034; *Arizona v. Gant*, 555 U.S. ——, ——, 129 S.Ct. 1710, 1719–20, 173 L.Ed.2d 485 (2009) (stating, in context of passenger compartment search incident to driver's arrest, "[n]either the possibility of access nor the likelihood of discovering offense-related evidence authorized the search in this case.").

Importantly, a warrantless arrest must be based on probable cause. *See United States v. Watson*, 423 U.S. 411, 417, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *United States v. Fiasconaro*, 315 F.3d 28, 34 (1st Cir.2002). An officer constitutionally may arrest an individual if he "has probable cause to believe that an individual has committed even a very minor offense in his presence." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001). Probable cause to make a warrantless arrest depends upon whether, at the moment the arrest was made, the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that the person to be arrested had committed or was committing an offense. *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). An arrest is not justified by what the subsequent search discloses. *Henry v. United States*, 361 U.S. 98, 103, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959) (citing *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948)). Moreover, "while a search without a warrant is … permissible if incident to a lawful arrest, if an arrest without a warrant is to support an incidental search, it must be made with probable cause." *Id.* at 102, 80 S.Ct. 168. Generally, if an arrest is not based on probable cause, then evidence obtained as a result of the arrest is inadmissible. *Fiasconaro*, 315 F.3d at 34 (citing *Brown v. Illinois*, 422 U.S. 590, 601–02, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Wong Sun v. United States*, 371 U.S. 471, 484–86, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Jorge*, 865 F.2d 6, 9–10 (1st Cir.1989)).

The question, then, is whether Officer Estrada, when he arrested Matías,[4] had probable cause to believe Matías had committed or was committing even a minor criminal offense. I conclude he did not. It is clear that the officers had abundant probable cause to arrest Torres. However, none of the information they had about Torres—that his vehicle's windows were illegally tinted, that he appeared intoxicated and had failed a sobriety test, that there was an open beer on the floor on his side of the vehicle—pertained to Matías in the least. Moreover, the utter absence of any observations about Matías in the officers' testimony provides no independent facts to support arresting Matías. The officers did not recognize him and did not ask him to identify himself, had no advance tips or other information about him, and did not know he was a felon on probation for murder. The only facts and circumstances they knew were that Matías was a passenger in the car of an illegally armed

---

4. The government's main argument—that Matías was searched incident to his valid arrest (*see* Docket No. 22, Part III.B)—assumes that Matías in fact was under arrest when Estrada found the firearm. Police intervention rises to the level of an arrest only when a reasonable man in the subject's position would understand his situation to be tantamount to an arrest in light of the totality of the circumstances. *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). There is no per se rule under the Fourth Amendment; the proper inquiry necessitates a consideration of all the circumstances surrounding the encounter. *United States v. Drayton*, 536 U.S. 194, 201, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002). Here, Matías had already been seized within the meaning of the Fourth Amendment when the vehicle in which he was riding was pulled over by police. *Brendlin*, 551 U.S. at 256–57. Robles told Estrada to arrest Matías, and Estrada immediately ordered Matías out of the pickup, read him the *Miranda* warnings, and handcuffed him. He then told Matías he would conduct a protective frisk and lifted Matías's shirt, uncovering the gun. Meanwhile, Matías's companion Torres had just been arrested by Robles. Given these circumstances, a reasonable man in Matías's position would have understood himself to be under arrest.

man whom they had just arrested for DUI at night. In short, there was no basis for a prudent person to think that Matías had done anything wrong, aside from his ill-starred choice to accept a ride home from Torres. As the arrest of Matías was unlawful, it could not support an incidental search, so the handgun found on Matías should be suppressed. *Henry*, 361 U.S. at 102, 80 S.Ct. 168.

### b. Protective frisk of passenger during traffic stop

Although the question is much closer, the same result follows even if the seizure and search of Matías did not rise to the level of an actual arrest.

The Supreme Court has recognized that traffic stops are "especially fraught with danger to police officers," *Michigan v. Long*, 463 U.S. 1032, 1047, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), and that all of a stopped vehicle's occupants pose a safety risk: the presence of passengers in addition to the driver is likely to increase the danger to an officer. *Maryland v. Wilson*, 519 U.S. 408, 415, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997). Accordingly, officers may order the driver and any passengers out of the car during a lawful traffic stop without violating the Fourth Amendment. *Id.* at 413, 117 S.Ct. 882; *Pennsylvania v. Mimms*, 434 U.S. 106, 111 & n. 6, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam). The Court recently noted that "the risk of a violent encounter in a traffic-stop setting 'stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop,'" and a passenger's motivation to use violence to prevent such a crime from coming to light "is every bit as great as that of the driver." *Arizona v. Johnson*, —— U.S. ——, 129 S.Ct. 781, 787, 172 L.Ed.2d 694 (2009) (quoting *Wilson*, 519 U.S. at 413–14, 117 S.Ct. 882). The *Johnson* Court held that pursuant to *Terry v.*

*Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), officers may pat down the driver or a passenger for weapons during a traffic stop, provided that they "harbor reasonable suspicion that *the person subjected to the frisk* is armed and dangerous." *Id.* at ——, 129 S.Ct. at 784 (emphasis added).

"The inquiry of whether an officer has reasonable suspicion to conduct a pat-down search requires a consideration of the totality of the circumstances to see whether the officer had a particularized, objective basis for his or her suspicion." *Estrada v. Rhode Island*, 594 F.3d 56, 66 (1st Cir. 2010) (internal citations and quotation omitted); *see also United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). The *Johnson* Court upheld the police frisk of a passenger in a lawfully stopped car where the frisking officer was concerned about a scanner she saw in his pocket, which she considered possibly indicative of criminal activity, and his clothing, which she viewed as consistent with gang membership. —— U.S. at ——, 129 S.Ct. at 785. Likewise, the First Circuit recently upheld a passenger patdown where the officer observed a bulge in the passenger's jacket pocket whose size and rigidity, coupled with the passenger's evasiveness in identifying the bulging object, provided reasonable suspicion that the passenger might be armed. *United States v. Chaney*, 584 F.3d 20, 26–27 (1st Cir.2009). Yet suspicious conduct on the part of the passenger, while sufficient to arouse reasonable suspicion, is not necessary when other factors are present. *United States v. Sakyi*, 160 F.3d 164, 169–70 (4th Cir.1998). The lateness of the hour and the number of occupants in the vehicle are factors that can arouse some safety concerns and may, combined with other factors, support a finding of reasonable suspicion. *United States v. Soares*, 451 F.Supp.2d 282, 288 (D.Mass.2006) (late

hour; three occupants; defendant disobeyed officer's orders); *United States v. Oliver*, 550 F.3d 734, 738–39 (8th Cir.2008) (late hour; odd, nervous conduct by driver and passenger).

In addition, when an officer reasonably suspects that illegal drugs are in a lawfully stopped vehicle, she may, absent ameliorating factors, frisk the occupants to allay her safety concerns, as the drugs may be attributable to any of the occupants and guns often accompany drugs. *Sakyi*, 160 F.3d at 169. In such a situation, an officer may reasonably infer a common criminal enterprise between the driver and the passengers, who has the same interest as the driver in concealing evidence of their wrongdoing. *See Maryland v. Pringle*, 540 U.S. 366, 372–73, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003); *Wyoming v. Houghton*, 526 U.S. 295, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999). Officers' advance information that a vehicle's occupants are likely to be armed or transporting drugs will also support a finding of reasonable suspicion. *United States v. Bell*, 762 F.2d 495, 500–01 (6th Cir.1985) (passenger patdown upheld where agents approaching vehicle knew that driver, suspected of being armed and dangerous, had close ties to known gun trafficker and officers could not yet be certain of passenger's identity); *United States v. Street*, 2008 WL 1744595, at *5 (E.D.Tenn. Apr. 15, 2008) (passenger patdown upheld where driver was armed and officers had tip that vehicle's occupants were en route to make a drug delivery).

Importantly, however, "neither the police nor a court may 'rely on a generalized risk to officer safety to justify a routine "pat-down" of all passengers as a matter of course.'" *United States v. Starks*, 301 F.Supp.2d 76, 86 (D.Mass.2004) (quoting *Sakyi*, 160 F.3d at 168–69; citing *United States v. Paradis*, 351 F.3d 21, 29 (1st Cir.2003)). Moreover, "the Supreme Court has repeatedly emphasized that the police may not frisk persons simply because they happen to be in the same place as someone whom the police may lawfully search." *Id.* at 85 (D.Mass.2004) (citing *Ybarra v. Illinois*, 444 U.S. 85, 92–93, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979); *United States v. Di Re*, 332 U.S. 581, 583, 68 S.Ct. 222, 92 L.Ed. 210 (1948)).

While several courts of appeals in the years after Terry adopted the "automatic companion rule" that the automobile companion of an individual being arrested is automatically subject to a protective frisk, *see, e.g., United States v. Del Toro*, 464 F.2d 520 (2d Cir.1972); *United States v. Berryhill*, 445 F.2d 1189 (9th Cir.1971), other circuits subsequently rejected it. *Bell*, 762 F.2d at 498–99; *see also United States v. Menard*, 95 F.3d 9 (8th Cir.1996); *United States v. Flett*, 806 F.2d 823 (8th Cir.1986). The automatic companion rule's validity was called into question over thirty years ago by the Supreme Court's statement in *Ybarra* that "a person's mere propinquity to others independently suspected of criminal activity does not, *without more*, give rise to probable cause to search that person." 444 U.S. at 86, 100 S.Ct. 338 (citing *Sibron v. New York*, 392 U.S. 40, 62–63, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968)) (emphasis added). *See generally State v. Henderson*, 906 A.2d 232, 236–37 (Del.Super.2005) (collecting and comparing automatic companion rule cases). Although *Ybarra*, which concerned searches of patrons in a tavern, has since been distinguished in the context of car stops, *e.g., Pringle*, 540 U.S. at 372–73, 124 S.Ct. 795, courts upholding passenger patdowns require additional factors besides "mere propinquity." *E.g., United States v. Wilson*, 506 F.3d 488, 494–95 (6th Cir.2007) (passenger's proximity to driver is "relevant, but not dispositive, to the analysis," as "the government must indeed show additional factors in order for the search to

be constitutional"); *United States v. Lansdowne,* 296 Fed.Appx. 268, 269–70 (3d Cir. 2008) (unpublished) (in addition to defendant passenger's proximity to fellow passenger with butt of gun visible on his person, traffic stop occurred late at night in a high-crime area and driver could not produce car's registration); *United States v. Hall,* 2008 WL 57083, at *4 (W.D.Ky. Jan. 3, 2008) (upholding patdown of passenger after driver's arrest where officer recognized passenger as having a known history of drug activity, passenger appeared under the influence of drugs, and lone officer was outnumbered by car's occupants).

A case from the Sixth Circuit is illustrative. In *United States v. Robinson,* a case where the arresting officers' actions were similar to those in the case at bar, the Sixth Circuit upheld the district court's suppression of evidence found during the patdown of a motorcyclist for lack of reasonable suspicion that he was armed and dangerous. 149 F.3d 1185, 1998 WL 322656, at *5 (6th Cir.1998) (unpublished). In *Robinson,* during an early-morning stop, one officer told another officer to frisk defendant Robinson after finding concealed weapons on Robinson's companion, a fellow motorcyclist dressed, like Robinson, in a Hell's Angels jacket. The court disregarded the facts that the men were motorcycle riders, members of the Hell's Angels, finding these facts were not bases for *"objectively* reasonable suspicion," leaving little other than the discovery of the companion's concealed weapons as the reason for frisking Robinson. The court concluded that to uphold the patdown on these facts would be too close to the automatic companion rule the court had rejected in *Bell. Id.*

While the First Circuit has not explicitly considered the automatic companion rule, its very recent reaffirmation of the "totality of the circumstances" standard and the current state of Supreme Court jurisprudence lead me to conclude that the First Circuit would not adopt the rule. Rather, I believe that the court would agree with the Sixth and Eighth Circuits that a vehicle occupant's propinquity to an arrestee is simply one fact to be considered in evaluating the totality of the circumstances. *See Bell,* 762 F.2d at 499 n. 4 (reading *Ybarra* to hold that "proximity cannot be the sole legitimizing factor" for a search).

Here, the record contains absolutely no evidence that the officers noticed anything amiss in Matías's demeanor or behavior; indeed, the police did not interact with him at all up until the discovery of Torres's concealed, unlicensed gun, which provided the officers' only stated reason for searching Matías. In fact, all of the circumstances noted by the government to justify the search and arrest of Matías pertained to Torres: it was Torres who owned and drove the vehicle with tinted windows, who was intoxicated, who (apparently) was responsible for the open beer container, and who possessed a firearm without a license. None of the circumstances are attributable to Matías.

Moreover, the facts of this case are distinguishable from those cases where courts have upheld the frisk of a passenger: there is no evidence that the stop occurred in a high-crime area; Torres had promptly produced his license and registration (averting any suspicion that the vehicle was stolen); Torres complied with all of Robles's orders and apparently exhibited no conduct to raise suspicion of any criminal activity beyond DUI; Matías likewise did not behave suspiciously, and there is no testimony that he appeared to be under the influence of alcohol or drugs; the officers were not outnumbered; neither Torres nor Matías was known to them, and they had no advance reason to think Torres would be traveling with an armed com-

panion. Furthermore, while there were drugs and drug paraphernalia in the pickup, they were not discovered until later, and there is no evidence the officers suspected during the stop that drugs were present. In short, there was no additional reason to suspect any common criminal enterprise that Matías might wish to hide.

To be sure, the situation Officers Robles and Estrada faced would give rise to some safety concerns, and the court has every sympathy for officers conducting traffic stops at night. It may be the case that other circumstances existed which were not brought out at the hearing. Yet I conclude that to find reasonable suspicion as to Matías on the facts before me would be tantamount to adopting the automatic companion rule and would allow police to invade an individual's personal security for being in the wrong company in the wrong place at the wrong time, contrary to *Terry*'s exhortation that warrantless searches be strictly circumscribed. *See Terry*, 392 U.S. at 25–26.

In sum, the totality of the circumstances of the traffic stop do not support a reasonable suspicion that Matías was armed and dangerous. The police therefore lacked justification to perform a protective frisk of Matías's outer clothing.[5] But to compound the situation, Officer Estrada did not carry out the frisk he said he would perform. Instead he lifted Matías's shirt, which entails a greater degree of invasive-ness than the constitutionally permissible limited intrusion of a *Terry* patdown. Importantly, there was no testimony that Estrada noticed a suspicious bulge under the shirt, which would motivate him to lift it. In the absence of reasonable suspicion to justify frisking Matías, it follows *a fortiori* that a more intrusive search was also proscribed. As Estrada's actions fell outside the bounds of the Fourth Amendment, defendant Matías's gun should be suppressed as the fruit of an unlawful search.

## B. Inventory Search of Torres's Vehicle

Although Matías is not charged with any drug offenses, he moves to suppress all evidence found in the search of Torres's vehicle, which includes drugs and drug paraphernalia. Matías argues that the search was illegal because it was not sufficiently contemporaneous to Torres's and Matías's arrests and neither man consented to the search. (Docket No. 19, p. 8–10).

■ Defendant mischaracterizes the vehicle search as a search incident to arrest rather than as an inventory search conducted pursuant to police impoundment of the vehicle. An exception to the Fourth Amendment search warrant requirement arises when the police, in the exercise of their "community caretaking functions," *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), acquire

---

5. The absence of reasonable suspicion to frisk Matías also forecloses any argument that, assuming Matías *was* under arrest, the handgun should still be admitted into evidence on a theory of inevitable disclosure. Though the fruits of an illegal arrest normally are inadmissible, if the prosecution can establish by a preponderance of the evidence that the police ultimately or inevitably would have discovered by lawful means the information sought to be suppressed, then the challenged evidence need not be excluded even though it was obtained through illegal governmental activity. *Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). A patdown of Matías might well have led to the gun's coming to light, but the patdown would not be lawful. And although officers may question passengers on matters unrelated to the stop's justification so long as those inquiries do not measurably extend the duration of the stop, *see Johnson*, —— U.S. at ——, 129 S.Ct. at 788 (internal citation omitted), there is no evidence that the officers would have questioned Matías—who, according to their testimony, they basically ignored—or that their inquiries would ultimately or inevitably lead to the discovery of the gun.

temporary custody of a privately-owned automobile. In such circumstances, the Supreme Court has held that a warrantless inventory search of the automobile made "pursuant to standard police procedures" and for the purpose of "securing or protecting the car and its contents" is a reasonable police intrusion which does not offend Fourth Amendment principles. *South Dakota v. Opperman,* 428 U.S. 364, 372–73, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976).

The *Opperman* Court identified three distinct interests which justify the inventory search of an automobile: 1) protection of the owner's property while in police custody; 2) protection of the police against claims regarding lost or stolen property; and 3) protection of the police from potential danger. *Id.* at 369. Before the need to protect these interests can arise, however, the government must have legitimately impounded the vehicle. *See United States v. Pappas,* 613 F.2d 324, 330 (1st Cir.1979) ("the lawfulness of a warrantless inventory search depends on the lawfulness of the seizure of the vehicle"). "[W]here a driver is arrested and there is no one *immediately* on hand to take possession, the officials have a legitimate non-investigatory reason for impounding the car." *Vega–Encarnación v. Babilonia,* 344 F.3d 37, 41 (1st Cir.2003) (emphasis in original). Additionally, "law enforcement officers are not required to give arrestees the opportunity to make arrangements for their vehicles when deciding whether impoundment is appropriate," *id.,* nor must officers obtain the vehicle owner's consent prior to conducting an inventory search of an impounded vehicle. *Opperman,* 428 U.S. at 375–76, 96 S.Ct. 3092.

■■■ Since Torres was under arrest and Matías did not own the vehicle, there was no one "immediately" on hand to take possession of the Ford Ranger. Thus, Robles and Estrada lawfully impounded the vehicle and subsequently undertook an inventory search of the vehicle's contents, with Torres nearby throughout the search. Robles's testimony that the officers prepared form PPR–128 and issued Torres a receipt shows that the inventory was made pursuant to standard police procedures. The receipt's issuance and Torres's presence to observe the search, coupled with the fact that the officers had previously discovered a loaded weapon the vehicle's owner, demonstrate that the search served at least one, if not all, of the three interests elucidated in *Opperman.* Accordingly, the evidence found in the Ford Ranger is admissible and the motion to suppress it should be denied.

## CONCLUSION

Based on the foregoing, I recommend that defendant's motion to suppress be **GRANTED** in part and **DENIED** in part.

This report and recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Because trial is set to begin on May 10, 2010, any objections to the same must be specific and must be filed with the Clerk of Court **by 5:00 p.m. Wednesday, May 5, 2010.** Failure to file timely and specific objections to the report and recommendation is a waiver of the right to review by the district court. *United States v. Valencia–Copete,* 792 F.2d 4 (1st Cir.1986).

**IT IS SO RECOMMENDED.**