**UNITED STATES of America**

**v.**

**Michael STARKS**

**No. CRIM.03–10187–DPW.**

United States District Court, D. Massachusetts.

Feb. 2, 2004.

William H. Connolly, United States Attorney's Office, Boston, MA, for USA, Plaintiff.

Miriam Conrad Federal Defender's Office, Boston, MA, for Michael Starks (1), Defendant.

### MEMORANDUM AND ORDER CONCERNING MOTION TO SUPPRESS

WOODLOCK, District Judge.

Defendant Michael Starks, accused of being a felon in possession of a firearm, moves to suppress the firearm and ammunition seized by police following a pat frisk of him on January 31, 2003. I find that the seizure was not supported by reasonable suspicion that Starks was engaged in criminal activity, and will allow the motion to suppress on grounds that the seizure violated the Fourth Amendment.

## I. BACKGROUND

### A. Findings of Fact

In the early morning hours of January 21, 2003, Starks was a passenger in a black Jeep Grand Cherokee driven by Wanda Crosby in Brockton, Massachusetts. Brockton police officers Andrew Kalp and John Leary were monitoring traffic at that time from the parking lot of a strip mall on Westgate Drive in Brockton. Among Brockton police, this general area of

Brockton is well known as an area for drug trafficking.

Approximately fifty feet from the police cruiser was an entrance to Westgate Drive Extension, formerly known as Holiday Inn Drive, a roughly semicircular access road that serves a Holiday Inn and is connected at both ends to Westgate Drive.

At approximately 3:30 AM, Officer Kalp observed the black Jeep; whether it was on Westgate Drive proper or the access road, he does not recall. Soon after initially observing the Jeep, Officer Kalp noticed that the rear license plate light was not illuminated; when he observed this, the Jeep was on the access road, heading towards the Holiday Inn. Officer Kalp decided to stop the vehicle for a violation of Mass. Gen. Laws ch. 90, § 6.[1]

The officers pulled the Jeep over in the Holiday Inn parking lot in front of the entrance to the hotel. Officer Kalp approached the driver's side of the Jeep and Officer Leary approached the passenger's side. Officer Kalp asked for (and received) Crosby's license and registration. Officer Leary asked for Starks' identification; Starks, who apparently did not hold a driver's license, gave him a Massachusetts state identification card. The officers then returned to their cruiser. Starks was neither instructed to remain in the vehicle, nor informed that he could leave. Back in the police cruiser, Officer Kalp checked the status of Crosby's license via the mobile data terminal. The computer check revealed that Crosby's license was suspended.[2]

The officers then returned to the Jeep, with Officer Kalp again approaching the driver's side and Officer Leary the passenger's side. Officer Kalp asked Crosby to exit the car. Starks, meanwhile, asked Leary for his identification back; Officer Leary told him to wait in the Jeep. The officers then returned to the police cruiser, this time with Crosby.

Inside the cruiser, Officer Kalp informed Crosby that he would issue her a citation for operating with a suspended driver's license and a defective rear license plate light, and that she would be free to leave once he had issued the citation. Although it was not expressed in the record, apparently Officer Kalp intended that she would have to arrange for a licensed driver to remove the car.

While he was writing the ticket, or shortly afterwards, a conversation ensued, and it somehow emerged that Crosby had a pending drug trafficking case. This pending case, combined with the general reputation of the area for drug trafficking and the early morning hour, aroused Officer Kalp's suspicion. He asked for consent to search the Jeep, and Crosby consented.

The officers again approached the Jeep so that Officer Kalp could search it.[3] Officer Leary decided to conduct a pat frisk of Starks, based on Crosby's drug arrest, the time of day, and his concern for safety during Kalp's impending search of the vehicle, particularly on the assumption that drugs and weapons often go together. Officer Leary stood directly in front of the

---

1. "Every motor vehicle ... when operated in or on any way in this commonwealth shall have its register number displayed conspicuously thereon by the number plates .... and during the period when the vehicle or trailer is required to display lights the rear register number shall be illuminated so as to be plainly visible at a distance of sixty feet."

2. The officers apparently did not check Starks' identification card through the mobile data terminal. (Tr. 25, 52.)

3. Crosby was at this point standing outside, somewhere near the hotel entrance.

Jeep's passenger door and told Starks to step outside.

Starks exited the vehicle, coming very close to Officer Leary, who stood in front of the door. Officer Leary then reached out and placed his hand on Starks, who said words to the effect of, "I gave you my I.D., why do you have to search me?" Officer Leary told Starks that because of their close proximity, he wanted to ensure that Starks was not carrying a weapon. Leary then attempted again to frisk Starks, who backed away towards the rear of the vehicle and raised his hands in an open-handed gesture of surrender, to indicate that he was not carrying a weapon.

Officer Kalp then came around from the driver's side of the vehicle. The two officers grabbed Starks' arms and pinned him against the Jeep, where Leary frisked him. Leary felt the butt of a gun, and removed a loaded Glock .40 caliber pistol from Starks' waistband. The record does not reflect whether the search of the car yielded any contraband or other evidence of a crime.

### B. Procedural History

On April 10, 2003, over two months after the encounter in the Holiday Inn parking lot, an agent of the Bureau of Alcohol, Tobacco, and Firearms swore out a criminal complaint against Starks, alleging that Starks was a felon in possession of a firearm in and affecting interstate commerce, in violation of 18 U.S.C. § 922(g)(1). On May 28, 2003 a grand jury indicted Starks on that charge.

On October 20, 2003 Starks moved to suppress all evidence derived from, and fruits of, the January 31 search, on the grounds that the police had neither a warrant, probable cause, nor reasonable suspi-

cion to search him. An evidentiary hearing was conducted on November 19, 2003, during which Starks, Kalp, and Leary testified, and during which Starks moved to suppress on the additional ground that the initial traffic stop was improper because Westgate Drive Extension is not a "way" within the meaning of Mass. Gen. Laws ch. 90, § 6.

I ordered the parties to submit additional briefs concerning the "way" question, and the authority of police officers to conduct a pat frisk of an individual present during the course of a consent search. A final hearing was conducted on January 28, 2004.

### II. DISCUSSION

Starks moves to suppress the evidence obtained from the frisk, and identifies three separate points in time when the officers allegedly violated the Fourth Amendment to the United States Constitution.[4] Stated chronologically for purpose of clarity, those three grounds are: (1) that the traffic stop itself was an unconstitutional seizure, because the officers did not have probable cause to believe a traffic violation had occurred, since Westgate Drive Extension is not a "way" within the meaning of Mass. Gen. Laws ch. 90, § 6; (2) that even assuming the validity of the stop, the officers' temporary detention of Starks was (or, after Officer Kalp issued Crosby's citation, became) an unconstitutional seizure, because the officers lacked any particular reasonable suspicion that Starks was carrying contraband or a weapon; and (3) that even assuming the validity of Starks' detention, the frisk was an unconstitutional search. I will address these arguments in turn.

---

**4.** "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

## A. The Traffic Stop

 Starks first argues that the stop was invalid because the officers did not have probable cause to believe that a traffic violation had occurred. "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Indeed, the police may stop a vehicle on less than probable cause; an investigative stop can be justified by "a reasonable and articulable suspicion of criminal activity." *United States v. Chhien,* 266 F.3d 1, 6 (1st Cir.2001). However, without reasonable suspicion, the stop is unlawful. *See, e.g., United States v. Johnson,* 256 F.3d 214, 216–17 (4th Cir. 2001) (stop was unlawful, where officer had no reasonable suspicion to believe that car with Georgia license plate was subject to South Carolina "window tinting" law, which only applied to cars required to be registered in South Carolina); *United States v. Freeman,* 209 F.3d 464, 466 (6th Cir.2000) (stop was unlawful because officer, having observed "one isolated incident of a large motor home partially weaving into the emergency lane for a few feet and an instant in time," lacked probable cause to believe that it had violated statute requiring vehicle to be "driven as nearly as practicable entirely within a single lane").

 Even an officer's good-faith belief that a law has been violated is insufficient if the officer has misunderstood the law. *See United States v. Twilley,* 222 F.3d 1092, 1096 (9th Cir.2000) (where an officer thought that Michigan required cars to have two license plates, but it indeed only required one, a stop based on the two-plate theory was not based on reasonable suspicion); *United States v. Lopez–Valdez,* 178 F.3d 282, 288 (5th Cir.1999) (stop was unlawful where state trooper had good-faith but erroneous belief that vehicle's broken taillight violated Texas law). "[T]he officer need not perfectly understand the law when he stops the vehicle, [but] his observation must give him an objective basis to believe that the vehicle violates the law." *Twilley,* 222 F.3d at 1096.

Here, driving without an illuminated license plate is a traffic violation when the vehicle is "operated in or on any way in [the] commonwealth." Mass. Gen. Laws ch. 90, § 6. Thus, if Westgate Drive Extension is not, in fact, a "way," then the Jeep would not have violated the statute. In Chapter 90, Massachusetts has defined a "way" as "any public highway, private way laid out under authority of statute, way dedicated to public use, or way under the control of park commissioners or body having like powers." *Id.* ch. 90, § 1. Officer Kalp does not recall where the Jeep was when he first saw it. (Tr. 18) However, it was about a quarter of the way up the access road when he noticed that it had a defective plate light. (*Id.*) Thus, Starks argues, Officer Kalp only observed it on Westgate Drive Extension, which Starks contends is not a "way," and therefore there was no violation.

 The government presents the affidavit of Howard Newton, Superintendent of Engineering for the City of Brockton, who avers that Westgate Drive Extension, though a "private way," is in fact "dedicated to public use." (Newton Aff., Doc. 32, ¶ 3.) I need not explore the precise definition of "way" for purposes of § 6 or determine if a "private way" may also be a "way dedicated for public use" under the statute because, even if Westgate Drive Extension is not a "way" for purposes of the license plate illumination law, it is undisputed that Westgate Drive itself is a public way. Based on the fact that the Jeep was observed driving with a defective license plate light just a quarter of the distance from the intersection of Westgate Drive,

Officer Kalp could reasonably have inferred that the light had not suddenly failed when the Jeep had turned onto the access road, but rather had been defective all along.[5] I find that Officer Kalp had reasonable suspicion, and in fact probable cause, to believe that a traffic violation had occurred.

## B. The Detention of Starks

■ Starks next argues that, even if the stop was justified, his detention was not. Starks was "seized" within the meaning of the Fourth Amendment because the police took his identification and ordered him to remain in the car. (Tr. 61–62) "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons'" under the Fourth Amendment. *Whren*, 517 U.S. at 809–10, 116 S.Ct. 1769. Furthermore, the officers had no particularized reasonable suspicion that Starks was carrying contraband or a weapon. Indeed, he had not acted in a suspicious manner, and neither officer believed he was armed or dangerous. (Tr. 28, 50)

The validity of Starks' detention may be analyzed in two discrete time periods: whether the detention was valid at the outset, and whether, even if the detention was initially valid, it remained valid after Crosby's citation had been completed.

■ Whether an officer may detain a passenger during a traffic stop is an open question. It is settled that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." *Maryland v. Wilson*, 519 U.S. 408, 415, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997). This is justified by concerns for officer safety. However, the Supreme Court "express[ed] no opinion" on whether "an officer may forcibly detain a passenger for the entire duration of the stop." *Id.* at 415 n. 3, 117 S.Ct. 882. The First Circuit has held that an officer may order the *driver* to remain in the vehicle while he investigates the *passenger* outside. *See United States v. Sowers*, 136 F.3d 24, 28 (1st Cir.1998). While neither the Supreme Court nor the First Circuit has reached the mirror case, such as that presented here, the Third Circuit has, and has concluded that an officer may order a passenger to remain in the car with hands raised. *United States v. Moorefield*, 111 F.3d 10, 13 (3d Cir.1997).

■ In general, the trend in the Supreme Court's jurisprudence has been to treat drivers and passengers alike for Fourth Amendment purposes in the context of a traffic stop. For example, *Wilson* relied heavily on *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), in which the Court had ruled that the Fourth Amendment was not offended by an officer's order to a *driver* to exit the vehicle. The *Wilson* Court recognized that the same officer safety and personal liberty concerns apply to passengers as drivers and therefore extended the rule of *Mimms* to passengers. *See Wilson*, 519 U.S. at 413–15, 117 S.Ct. 882. For this reason, I hold that an officer may, consistent with the Fourth Amendment, detain a passenger during a traffic stop, even without particularized reasonable suspicion that the passenger has committed any crime.

■ That said, the authority of the police to detain even the driver is limited to the time "pending completion of the stop." *Wilson*, 519 U.S. at 415, 117 S.Ct. 882.

5. Officer Kalp's failure to observe the plate light while the Jeep was still on Westgate Drive would of course bear on whether the inference is sufficiently compelling to establish Crosby's guilt on the Mass. Gen. Laws ch. 90, § 6 charge. But the existence of the inference is plainly sufficient to establish reasonable suspicion.

"[A] Fourth Amendment violation occurs when the detention extends beyond the valid reason for the stop. Once a computer check is completed and the officer either issues a citation or determines that no citation should be issued, the detention should end and the driver should be free to leave." *United States v. Santiago*, 310 F.3d 336, 341–42 (5th Cir.2002); *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995) ("Once the purposes of the initial traffic stop were completed, there is no doubt that the officer could not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention."); *United States v. Sandoval*, 29 F.3d 537, 540 (10th Cir.1994) ("[w]hen the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.... [unless] during the course of the traffic stop the officer acquires an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity," or the driver consents).

█ Here, the purpose of the stop was completed once Officer Kalp issued Crosby's citation. *See United States v. Beck*, 140 F.3d 1129, 1136 (8th Cir.1998) (purpose of stop completed once officer completed license and criminal history check on driver, and gave him oral warning for

following too closely). The only new information that the officers gained, and which, they asserted, warranted further investigation, was Crosby's pending drug trafficking case followed by Crosby's consent to the search of the automobile. But this does not justify further detention of *Crosby*, let alone Starks. *Cf. United States v. Garcia*, 23 F.3d 1331, 1335–36 (8th Cir. 1994) (after initial stop had ended, officer learned that passenger had been arrested for a firearms violation, and called in backup to stop vehicle again; second stop violated the Fourth Amendment because subsequent information about arrest did not create reasonable suspicion). Indeed, even after learning of this pending trafficking case, Officer Kalp informed Crosby that she would be "free to leave once [he] had issued her the citation."[6] (Tr. 25)

█ Starks' continued detention might have been justified if the officers had developed a reasonable suspicion that he himself was armed or carrying contraband. However, no such reasonable suspicion was developed. While the officers did not precisely articulate a basis for the continued *detention* distinct from Officer Leary's proffered basis for the *frisk*, I will assume that the same concerns motivated the continued detention.[7] Even assuming that those concerns—the early morning hour, the location known for drug activity, and Crosby's pending drug trafficking case— could generate new reasonable suspicion

6. Based on the officers' testimony at the evidentiary hearing, it appears that Officer Kalp did not intend, or anticipate, further detaining or frisking Starks, and that Officer Leary's attempts to frisk Starks came as something of a surprise to Officer Kalp. *See infra* note 8.

7. In all likelihood, the officers did not think of the situation as a continued detention. Probably very little time elapsed from the moment when Crosby's citation was completed to the moment when Starks was ordered out of the car. Indeed, Officer Kalp testified that "there

was no reason to keep him there" and that, had he been in Officer Leary's position, he "would have allowed" Starks to simply walk away. (Tr. 44–45) Nevertheless, because Starks was *not* informed that he was free to leave, and in fact Officer Leary ordered Starks to exit the car while standing directly in front of him, Starks was detained after the purpose of the traffic stop had ended. Because the frisk took place in the context of this further detention, if the detention was unlawful, then the frisk was unlawful as well.

as to Crosby, they could not constitute reasonable suspicion as to Starks.

Starks had not acted suspiciously during the stop; neither officer testified that he suspected that Starks might be armed; and Officer Kalp even agreed that "there was no reason to keep him there." (Tr. 28, 44–45, 50, 55–56.) The fact that he was in a car with Crosby did not taint Starks with reasonable suspicion. Reasonable suspicion does not arise even if the defendant is observed talking to "known narcotics addicts" over an eight-hour period. *Sibron v. New York*, 392 U.S. 40, 64, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) (decided the same day as *Terry* ). Nor does it arise where a defendant, who has a prior criminal record, notices a detective, veers away, and walks away at an increased pace. *United States v. Santillanes*, 848 F.2d 1103, 1105 (10th Cir.1988). *A fortiori*, it follows that reasonable suspicion does not arise from the fact that a defendant, whom the police do not know to have a criminal record, and who complies with all police instructions, associates with a person with one pending narcotics case.

This case is easily distinguished from cases where a police officer could reasonably conclude that a passenger and driver were engaged in a common criminal enterprise. Early in the current Term, the Supreme Court in *Maryland v. Pringle*, — U.S. —, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003), addressed a case where a police officer discovered cocaine on a consent search of an automobile. Since the officer had probable cause to believe a felony had been committed, the Court ruled that the officer was entitled to conclude that "any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine," and therefore that probable cause existed as to the defendant, who was the front-seat passenger. *Id.* at 800. The instant case is similarly unlike *United States v. Sakyi*, 160 F.3d 164, 170 (4th Cir.1998), where the officer was "entitled to conclude that [the passenger] was voluntarily in the vehicle and that [the passenger] and the driver were proceeding on a common course with a common purpose," such that the presence of (arguable) drug paraphernalia "cast suspicion not only on the driver, but also on [the passenger]."

Both *Pringle* and *Sakyi* involved specific evidence of drugs in the vehicle, and the officers in those cases were entitled to assume that all occupants had some connection to the drugs. Here, even if Crosby's prior drug arrest could create reasonable suspicion as to her, it had no nexus with Starks. It is unreasonable to conclude that, because the driver had once been arrested for drug trafficking, the passenger is therefore potentially armed or involved with contraband. In fact, the officers did not appear actually to suspect that Starks might be armed; they left him "essentially unattended" during the time that they were in the cruiser with Crosby.[8] (Tr 41–42)

■ One other potential justification for Starks' continued detention should be addressed. Since Crosby did not have a valid license, and since the Jeep was blocking the hotel entrance, the police had a valid interest in finding a lawful way for the vehicle to be removed. Officer Kalp told Crosby that "we would allow the passenger of the vehicle to operate it from the scene provided he had an active Massachu-

---

8. Kalp did not intend or expect to frisk Starks, and only learned that Officer Leary had decided to frisk Starks "[a]fter [they] handcuffed Mr. Starks and discussed the situation." He does not know "exactly when [Officer Leary] formulated" the idea of frisking Starks, and it came as "absolutely" a "complete surprise" when Officer Leary frisked Starks. (Tr. 42)

setts license." (Tr. 25) Officer Kalp recalls that Starks' license status was checked by one of the two officers, but does not recall which; Officer Leary believes that he took Starks' identification, but did not check to see if he actually had a valid license. (Tr. 25, 52) Since Starks testified that Officer Leary took Starks' identification at the beginning of the stop, at the same time that Officer Kalp took Crosby's license, the most natural reading of the officers' testimony is that Leary took Starks' Massachusetts state identification card (which is not a driver's license, and does not look like one) at the beginning of the encounter, and never did anything further with it. (*See* Tr. 61) It appears that Officer Leary did not inform Officer Kalp that Starks had presented an identification card that was not a driver's license. In any case, neither officer testified that they approached the Jeep for the final time, or continued to detain Starks, for the purpose of ascertaining whether he could lawfully drive the vehicle away.[9] Therefore, this purported justification—advanced in the government's briefs, but not by either police witness—cannot justify Starks' continued detention.

For these reasons, I find that the detention of Starks beyond the completion of Crosby's citation violated the Fourth Amendment.

## C. The Frisk

### 1. *The reasonable suspicion standard*

Even if I were to hold that Starks was validly detained beyond the completion of Crosby's citation—perhaps on the theory, not supported by any testimony, that Officer Leary was preparing to return his identification and tell him he was free to leave while Officer Kalp searched the

Jeep—I would still find that the frisk violated the Fourth Amendment.

As a general matter, a police officer may frisk a person upon a reasonable suspicion "that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The test is "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* The officer may not rely on an "inchoate and unparticularized suspicion or 'hunch,'" but rather only on "specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Id.* Furthermore, the Fourth Amendment does not "permit[ ] a frisk where, although the circumstances might pass an objective test, the officers in the field were not *actually* concerned for their safety." *United States v. Lott*, 870 F.2d 778, 783–84 (1st Cir.1989).

Both before and after *Terry*, the Supreme Court has repeatedly emphasized that the police may not frisk persons simply because they happen to be in the same place as someone whom the police may lawfully search. *See Ybarra v. Illinois*, 444 U.S. 85, 92–93, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) (police, who had warrant to search bar and bartender for unlawful drugs, could not frisk a customer who happened to be in the bar without "a reasonable belief that he was armed and presently dangerous"); *United States v. Di Re*, 332 U.S. 581, 583, 68 S.Ct. 222, 92 L.Ed. 210 (1948) (police, who had arrested driver of car pursuant to informant's tip that he was selling counterfeit ration cou-

---

9. Officer Kalp did testify that he had no intention of towing the Jeep, possibly because he believed that it could be left in the hotel parking lot until Crosby could arrange for a licensed driver to move it for her. (Tr. 28, 32–33)

pons, could not frisk passenger who happened to be in car). Even when police have probable cause to search the car for a contraband object, they are permitted to "inspect passengers' belongings found in the car that are capable of concealing the object of the search," *Wyoming v. Houghton,* 526 U.S. 295, 307, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999), but this authority "does not extend to the search of a person found in that automobile," *id.* at 308, 119 S.Ct. 1297 (Breyer, J., concurring) (distinguishing *Ybarra* and *Di Re* as involving search of persons, which constituted greater intrusion than search of things).

 To be sure, the police may take a variety of safety measures as part of an investigative stop, even without particularized reasonable suspicion. An officer may order the occupants out of the vehicle. *Wilson,* 519 U.S. at 414–15, 117 S.Ct. 882 (passengers); *Mimms,* 434 U.S. at 111, 98 S.Ct. 330 (driver). If the officer develops a reasonable suspicion that an occupant is dangerous, the police may search for weapons in the vehicle's passenger compartment. *Michigan v. Long,* 463 U.S. 1032, 1049, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). But this does not provide a basis to frisk a passenger, as part of a consent search of the vehicle, without particularized reasonable suspicion as to that passenger. In fact, the police cannot even search the *car* without reasonable suspicion. *Knowles v. Iowa,* 525 U.S. 113, 117–18, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998). Moreover, neither the police nor a court may "rely on a generalized risk to officer safety to justify a routine 'pat-down' of all passengers as a matter of course." *Sakyi,* 160 F.3d at 168–69; *cf. United States v. Paradis,* 351 F.3d 21, 29 (1st Cir.2003) (where government arrested defendant in girlfriend's apartment pursuant to warrant, but then searched apartment, search could not be justified as "protective sweep" because "officers had no reason to believe

that there might be an individual posing a danger to the officers or others").

### 2. *Protective frisk incident to consent search*

 The government's strongest argument is that, once the police had received Crosby's consent to search the car, they had to remove Starks from the car in order to search it, and, since he *might* be armed, it was reasonable for them to frisk him before placing themselves in a vulnerable position.

Neither the Supreme Court nor the First Circuit has addressed whether an officer may perform a protective frisk of a passenger in order to effectuate an automobile search justified by the consent of the driver. In *Sakyi,* the Fourth Circuit held that "in connection with a lawful traffic stop of an automobile, when the officer has a reasonable suspicion that illegal drugs are in the vehicle, the officer may, in the absence of factors allaying his safety concerns, order the occupants out of the vehicle and pat them down briefly for weapons to ensure the officer's safety and the safety of others." 160 F.3d at 169. However, *Sakyi* is not on point here because the officers there had reasonable suspicion that, even if not particularized to each of the occupants, was sufficient to taint all of them. *See id.* at 170; *see also Pringle,* 124 S.Ct. at 800. Here, even if the police had reasonable suspicion sufficient to frisk Crosby, that reasonable suspicion did not taint Starks.

The only case that lends some support to the government's position is *United States v. Manjarrez,* 348 F.3d 881 (10th Cir.2003). There, a lone officer conducted a consent search of the defendant's vehicle after the stop had concluded, and frisked the defendant before that search. *Id.* at 881. While the frisk yielded no evidence, the consent search did, and the defendant

moved to suppress the evidence obtained from the search on the grounds that the frisk vitiated the prior consent. *Id.* at 885. The Tenth Circuit was "unable to discern how a subsequent pat-down, lawful or not, could bear upon the voluntariness of Defendant's prior consent." *Id.* at 887. Nevertheless, arguably in dictum, the court reached the question of whether the frisk was unlawful. It decided that the frisk was lawful, because the trooper, who was alone, was reasonably concerned for his own safety. *Id.* at 887–88. This case is easily distinguished, because *two* officers were present. Since the officers had already decided that Crosby was not dangerous—not only had they not decided to frisk her, but they had left her standing by the hotel entrance while they approached the Jeep to search it—one of them easily could have kept a close eye on Starks while the other searched the car.

▮▮▮▮ Perhaps most importantly, the government's reasoning would allow the police to create a potential risk, and then exploit that purported risk to the detriment of a passenger's Fourth Amendment rights. The officers had no reasonable suspicion that either Crosby or Starks was dangerous. Nevertheless, Officer Kalp voluntarily decided to ask for Crosby's consent to search the car. By doing so, Kalp created the "threat" (if any) to officer safety.[10] The officers could not then exploit this threat to frisk a passenger, against whom they had no reasonable suspicion, to protect themselves from this self-created danger. As Justice Harlan's influential *Terry* concurrence observed:

*Any person, including a policeman, is at liberty to avoid a person he considers dangerous.* If and when a policeman has a right instead to disarm such a person for his own protection, he must first have a right not to avoid him but to be in his presence. That right must be more than the liberty (again, possessed by every citizen) to address questions to other persons, for ordinarily the person addressed has an equal right to ignore his interrogator and walk away; he certainly need not submit to a frisk for the questioner's protection.

*Terry*, 392 U.S. at 32–33, 88 S.Ct. 1868 (Harlan, J., concurring) (emphasis added). I therefore hold that the police may not frisk a passenger on the mere basis that the driver had consented to a search of the automobile, without particularized reasonable suspicion as to the passenger or concerns for officer safety not present here.

### III. CONCLUSION

For the reasons set forth more fully above, Starks' motion to suppress is GRANTED.

▮▮▮▮▮▮

10. I do not mean to suggest that there can be no threat to officer safety under circumstances such as these, although here neither officer offered any basis to believe that there was any particularized basis to have concern for safety. In any event, the information that the officers had at the time did not give rise to reasonable suspicion that there was. The police no doubt occasionally, out of concern for officer safety, take certain precautions that exceed the bounds of what the Fourth Amendment permits. Perhaps, for purposes of officer safety, they are prudent to do so. But for purposes of obtaining a criminal conviction, the evidence obtained by such methods will be inadmissible.