Filed 6/24/14  P. v. Davolt CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E057359 |
| v. | (Super.Ct.No. SWF1200933) |
| ELI TANNER DAVOLT, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Mark A. Mandio and Michael J. Rushton, Judges.  Affirmed.

D. Inder Comar, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Seth M. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant and appellant Eli Tanner Davolt guilty of one count of carrying a concealed dirk or dagger. (Pen. Code, § 21310.)[1] Defendant previously had a conviction for a violent felony and had served two other prison terms. The trial court imposed a sentence of the upper term of three years, doubled for a prior strike conviction. In addition, defendant was given additional one-year consecutive terms for each of the other two prior prison terms for a total sentence of eight years.

Six contentions are raised upon appeal: (1) the search that revealed the concealed knife violated defendant's Fourth Amendment rights; (2) the search was not incident to a proper arrest; (3) the concealed dagger statute infringes defendant's Second Amendment right to bear arms; (4) the concealed dagger statute is impermissibly vague under Fourteenth Amendment standards; (5) defendant charges prosecutorial misconduct at the sentencing hearing before the trial judge; and (6) defendant asserts the trial judge abused his discretion by sentencing defendant to the upper limit term for the primary offense. We find no error and affirm.

**FACTUAL AND PROCEDURAL HISTORY**

Riverside County Sheriff's Deputy Michael Mosca was the only trial witness. In his direct testimony, he told how he observed defendant in Lake Elsinore crossing Riverside Drive on foot, from a fast food parking lot to a convenience store parking lot. Deputy Mosca described Riverside Drive, at that section of Lake Elsinore, as a "pretty busy roadway," with one lane in each direction separated by a median lane. Deputy

---

[1] All further statutory references are to the Penal Code unless indicated.

Mosca stated that it "looked like [defendant] wasn't sure whether he was going to cross or stop," but defendant continued to cross the street, making an oncoming car have to stop abruptly. Deputy Mosca turned into the convenience store parking lot to follow defendant and contact him regarding the violation. Defendant was wearing a long, black, hooded sweatshirt and was wearing a two-handled duffel bag on his back "like a backpack." The sweatshirt and duffel bag both hung past defendant's belt line. Deputy Mosca told defendant to take off the duffel bag and sit on a nearby planter. He saw nothing suspicious in defendant's hands or on his person.

Deputy Mosca told defendant to stand up and put his hands behind his back so he could do a pat-down search. He asked defendant if he had "any sharp objects on him that would hurt me, stick me, or poke me"; defendant said he did not. Deputy Mosca then lifted defendant's sweatshirt to expose his waistband. He saw the silver handle of a knife in a sheath clipped to the back of defendant's belt or pants. The sheath was completely inside defendant's pants. Deputy Mosca did not notice the sheath when he lifted defendant's sweatshirt and saw the knife handle.

Deputy Mosca testified that he removed the knife and threw it to the ground. He then handcuffed defendant. Defendant, despite being cuffed, reached to the small of his back, so Deputy Mosca punched him in the ribs to prevent him from reaching another weapon.

On cross-examination, defense counsel reexamined the jaywalking arrest. Defense counsel asked Deputy Mosca about defendant's attempt to cross the street:

"[Defense counsel:] . . . So when you stated this pedestrian got to the median, and they kind of paused—kind of paused in the median?

"[Deputy Mosca:] No, he didn't pause. The—he was constantly walking.

"[Defense counsel:] Okay. Well, I believe you—did you state on direct examination that the other car started to slow down, because they were not sure whether he was going to continue crossing or not?

"[Deputy Mosca:] Correct.

"[Defense counsel:] So he kind of slowed his pace a little bit as if they weren't sure whether he was going to continue or not; correct? Is that a fair statement?

"[Deputy Mosca:] Slowed his pace, yes.

"[Defense counsel:] So he sees another car coming. He reaches the median and kind of slows his pace and sees who's going to go first? There's a little hesitation there; is that fair?

"[Deputy Mosca:] Yeah.

"[Defense counsel:] Okay. So at that point, it's fair to say that there's a little hesitation. It's kind of fair to say as an outside observer the pedestrian and vehicle, they saw each other because there was a little hesitation there. Would that be fair, as well?

"[Deputy Mosca:] Yes.

"[Defense counsel:] Okay. So at that point, you see the pedestrian continue to cross the street to the [convenience store]; correct?

4

"[Deputy Mosca:] Yes.

"[Defense counsel:] Then the car started going again or went at his normal speed?

"[Deputy Mosca:] No, the car was slowing.

"[Defense counsel:] Okay. So the car was slowing down and [the] pedestrian continued to walk across the street; correct?

"[Deputy Mosca:] Yes.

"[Defense counsel:] Then that car stopped instead of hitting that pedestrian?

"[Deputy Mosca:] Correct."

Prior to trial, defense counsel moved to bar introduction of the knife, which was uncovered pursuant to the search conducted by Deputy Mosca. Deputy Mosca testified that defendant's speech and demeanor while being questioned about the jaywalking led him to suspect that defendant was under the influence of a controlled substance, and motivated him to do the pat-down search for his own safety. Defendant had told Deputy Mosca that he had "injected heroin within the last three days and that he occasionally smoked methamphetamine." Deputy Mosca saw signs of intoxication, such as fidgeting hands, twitching, restlessness, and unintelligible speech. Deputy Mosca testified that once he suspected intoxication, defendant was no longer free to go. He then searched defendant to make "sure [defendant] didn't have any weapons or anything that could hurt me during my investigation."

5

In ruling on the motion, the court found Deputy Mosca had probable cause to stop defendant and investigate a jaywalking violation and that the deputy observed defendant as possibly under the influence of a controlled substance. The court further found Deputy Mosca's experience gave the deputy reason to suspect "that sometimes people that are using controlled substances carry weapons with them." Finding that Deputy Mosca behaved reasonably and had either probable cause or reasonable suspicion at each stage of his investigation, the court denied the suppression motion.

The prosecution filed motions in limine to be allowed to impeach defendant with his prior convictions if he took the stand. In addition, the prosecution requested the trial court inform the jury that, although defendant had prior felony convictions, the case was not being tried as a "Three Strikes" case. Both motions were granted. After the jury gave its verdict and was dismissed, defendant chose to admit his prior convictions.

Defense counsel urged the trial judge to impose a minimal sentence, saying "[W]e wouldn't be here if it wasn't for [defendant's] prior crimes. What we have here . . . is a minor offense which is elevated to where it is because of his prior; but this is not . . . of the spirit, I guess I would say, of the [T]hree [S]trikes law, what we contemplate as far as having penalties for such offenses." In arguing that the trial judge should impose a sentence at the high end of the range, the prosecutor rested on his sentencing request, adding only "I'll just point out, [defendant] is a three-striker." The second strike, a first degree burglary, was not listed in the probation report but a certified prior conviction was marked as evidence in the trial. Defendant was sentenced to the upper

6

term: three years for the concealed knife, doubled for the admission of the prior strike, and a year for each of the two prior convictions.

## DISCUSSION

### A. THE SEARCH

Defendant asserts the "pat-down" search that uncovered the knife was prohibited by the Fourth Amendment because Deputy Mosca had no reason to suspect that defendant was armed and dangerous. As a result, defendant argues the knife should have been suppressed by the trial court. We find no fault with the search.

In evaluating a challenge to the trial court's ruling on a motion to suppress evidence, we view the record in the light most favorable to the trial court's ruling and defer to its factual findings, whether express or implied, if they are supported by substantial evidence. "'[A]ll factual conflicts must be resolved in the manner most favorable to the [superior] court's disposition on the [suppression] motion.' [Citation.]" (*People v. Woods* (1999) 21 Cal.4th 668, 673-674.) We then exercise our independent judgment to decide what legal principles are relevant, independently apply them to the facts, and determine as a matter of law whether the search was unreasonable. (*People v. Glaser* (1995) 11 Cal.4th 354, 362.)

There are three categories of police contacts with individuals: consensual encounters, detentions, and arrests. "[A] detention does not occur when a police officer merely approaches an individual on the street and asks a few questions." (*In re Manuel G.* (1997) 16 Cal.4th 805, 821.) A detention occurs when an officer restrains a person's liberty to walk away by force or show of authority. (*Terry v. Ohio* (1968) 392 U.S. 1,

7

19, fn. 16 (*Terry*).) "A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*People v. Souza* (1994) 9 Cal.4th 224, 231.) A police officer's suspicion need only be reasonable to justify a detention. (*People v. Bennett* (1998) 17 Cal.4th 373, 386-387.)

A consensual encounter between police officers and an individual results in no restraint of an individual's liberty, and such an encounter may be initiated by police without any objective justification. (*Florida v. Royer* (1983) 460 U.S. 491, 497-498.) A detention, by contrast, is a seizure of an individual, more limited in duration, scope and purpose than an arrest, and is proper only where there is an "articulable suspicion that a person has committed or is about to commit a crime." (*Id.* at p. 498; *Wilson v. Superior Court* (1983) 34 Cal.3d 777, 784.) In *United States v. Mendenhall* (1980) 446 U.S. 544, 554, the Court determined that an individual is seized, for Fourth Amendment purposes, where "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (Fn. omitted.) (See also *Florida v. Bostick* (1991) 501 U.S. 429, 435-436 [police officers may ask questions of an individual, ask to examine the individual's identification, and request consent to conduct a search, so long as they do not convey a message that compliance with their requests is required].)

A police officer does not need probable cause to detain someone. (*United States v. Sokolow* (1989) 490 U.S. 1, 7-8.) A reasonable suspicion of involvement in criminal

activity will justify a temporary stop and detention even though the circumstances are also consistent with lawful activity. Typically, the purpose of the detention is to resolve the ambiguity. (*People v. Souza*, *supra*, 9 Cal.4th at p. 233; *In re Tony C.* (1978) 21 Cal.3d 888, 893-894, superseded by statute on another ground as stated in *People v. Lloyd* (1992) 4 Cal.App.4th 724, 733; *United States v. Arvizu* (2002) 534 U.S. 266, 274-276; *Sokolow*, at pp. 7-8.)

Law enforcement officers may conduct a pat-down search incident to a detention under circumscribed conditions. An officer may conduct a pat-down search to determine if a person is carrying a weapon after he or she observes suspicious behavior—prompting reasonable suspicion—indicative of someone who is armed and dangerous to the officer or others. (*Terry*, *supra*, 392 U.S. at p. 24.) The officer's pat-down search is justified by the need to "pursue [an] investigation without fear of violence," not to unearth evidence of a crime. (*Adams v. Williams* (1972) 407 U.S. 143, 146.) Before a police officer "places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so." (*Sibron v. New York* (1968) 392 U.S. 40, 64 (*Sibron*).) If the search extends beyond what is necessary to determine if the suspect is armed, it exceeds the allowable parameters of a *Terry* stop, resulting in suppression of the fruits of the search. (*Minnesota v. Dickerson* (1993) 508 U.S. 366, 373.) Otherwise, there is no violation.

Defendant asserts that Deputy Mosca saw "nothing suspicious" about defendant prior to conducting his search. Although defendant was slurring his speech, the deputy could understand defendant's answers to his questions, and defendant did nothing

9

furtive. Defendant was "fidgety, nervous, and possibly intoxicated," but cooperative, and under those circumstances there is nothing that justifies a search. The jaywalking violation did not justify a pat-down search: our Supreme Court held that typical pedestrian traffic violations do not justify pat-down searches. In *People v. Lawler* (1973) 9 Cal.3d 156, 162, our Supreme Court held that a defendant's apprehension or nervousness in talking with police was not "sufficiently unusual or suspicious to warrant a pat-down search." As defendant notes, the Supreme Court found pedestrian traffic violations do not involve the use of weapons. Since there was no "'no particularized concern for safety'" testified to by Deputy Mosca prior to the pat-down, it was unjustified.

Defendant argues that his appearance of intoxication likewise does not justify a search. In support of that point, he cites *Sibron*, *supra*, 392 U.S. 40. In *Sibron*, a police officer observed the defendant talking with some known addicts and took him aside to talk. The officer said, "'"You know what I am after,"'" and the defendant reached into his pocket. The officer simultaneously reached with him, and found several glassine envelopes containing heroin. (*Id*. at p. 45.) The *Sibron* court found it was clear the officer was seeking heroin and had no fear that the defendant was reaching for a weapon, hence there was no justification for the search into the defendant's pocket absent a criminal act. (*Id*. at p. 64, fn. 21.) Since there was nothing here to suggest

10

defendant was carrying a weapon, defendant asserts that there was no justification[2] for the search that found his knife. If the search was unlawful, its fruits must be suppressed. (*People v. Mayfield* (1997) 14 Cal.4th 668, 760.)

We find the search proper. Defendant's interaction with the police began as a casual encounter, prompted by his crossing of Riverside Drive. Deputy Mosca reasonably believed that defendant may have been jaywalking in violation of Vehicle Code section 21954. Defendant is correct that that violation did not justify a pat-down search. However, Deputy Mosca's testimony at the suppression hearing makes it clear the search was made only after he decided to detain defendant on a further suspicion. In discussing the traffic violation with defendant, Deputy Mosca observed that defendant appeared intoxicated; defendant admitted to methamphetamine use and the recent injection of heroin. Based upon his experience as a police officer, Deputy Mosca had a reasonable suspicion that defendant was intoxicated, perhaps by a controlled substance. Officer Mosca testified that, at that point, defendant was no longer free to go. The search that followed was incident to the detention caused by defendant's apparent intoxication and admitted drug use.

---

[2] Defendant also cites *United States v. Starks* (2004) 301 F.Supp.2d 76, 79, a federal district court case from Massachusetts, to show the assumption "that drugs and weapons often go together" is invalid. We note the person searched in *Starks*, a passenger in a car, was not the person with a pending drug trafficking case. The search of the driver was not at issue, and *Starks* holds only that the driver's criminal record does not justify searching her passengers. The precedent is not binding upon us, and, as discussed *post*, we find the reasoning unpersuasive.

11

Defendant's assertion that the search was unjustified rests upon the fact that there is no testimony by Deputy Mosca justifying a suspicion that defendant was armed. He states that it is an impermissible assumption that drugs and weapons often go together. However, no authority supports the proposition that it is impermissible to search *the person suspected* of a drug violation to ensure they are not carrying any weapons. Experienced police officers must be given the latitude to protect themselves during the investigation of drug violations through safety searches of intoxicated individuals. Intoxication impairs judgment and removes inhibitions, raising the danger of violence. In their respondent's brief, the People cite several California cases noting that drugs and weapons were associated. (E.g., *People v. Bradford* (1995) 38 Cal.App.4th 1733, 1739 ["[I]t is common knowledge that perpetrators of narcotics offenses keep weapons available to guard their contraband"].) Further, here there is an independent ground supporting the search. Defendant admitted recent intravenous drug use, and Deputy Mosca was concerned defendant was carrying something that would "hurt," "stick," or "poke" him. The deputy's safety required him, at the least, to be sure defendant was not carrying a hypodermic needle or other device that could accidently injure him, let alone anything that an intoxicated person would intentionally use as an improvised weapon.

Unlike in *Sibron*, the deputy's search here was not intended to discover contraband, was not invasive, and was prompted by more than defendant's association with drug users. The court found the search was prompted by Deputy Mosca's honest and reasonable apprehension that defendant might be carrying something that could

12

injure him. After conducting an independent review of the evidence, we find the suppression ruling is supported by substantial evidence and affirm.

B.      SEARCH PURSUANT TO ARREST

Defendant asserts that, if the knife was discovered as part of a search incident to an arrest, the arrest justifying the search took place after the search. He states "[t]o the extent the trial court's order could be interpreted to suggest that Deputy Mosca had probable cause to make an arrest prior to the search, such a finding is erroneous." Not having made such an interpretation, we affirm the court's decision not to suppress the knife.

A search may be conducted pursuant to an arrest to remove weapons and seize evidence. (*Arizona v. Gant* (2009) 556 U.S. 332, 338.) Defendant notes that the jaywalking violation probably does not justify a custodial arrest, hence a jaywalking violation would not cover the search that followed. On cross-examination, Deputy Mosca stated he usually just cited persons stopped for jaywalking. On this basis, defendant argues neither the jaywalking violation nor the weapons arrest justified the search that uncovered the knife. He does not discuss the intoxication investigation.

The People counter that an arrest is permissible in California for fine-only offenses. (*People v. McKay* (2002) 27 Cal.4th 601, 605.) Defendant replies that there was no probable cause for a jaywalking arrest because his crossing of Riverside Drive did not constitute an "'immediate hazard.'"

We have previously found probable cause existed for the investigation of the jaywalking violation, based upon Deputy Mosca's testimony that the oncoming car was

13

forced to stop quickly to avoid hitting defendant because of his untimely crossing. Most significantly, there was no finding here, or in the trial court, that the search was justified because it was incident to an arrest. As set forth in section A *ante*, the search was justified as a necessary precaution for officer safety pursuant to a detention for investigation of possible intoxication. Accordingly, we again affirm the trial court's suppression ruling.

## C.    SECOND AMENDMENT RIGHTS

Defendant asserts that section 21310[3] violates his right to keep and bear arms under the Second Amendment to the United States Constitution. Defendant argues that, because the statute contains an overbroad, blanket prohibition against carrying a concealed dirk or dagger on one's person, the statute violates the Second Amendment right to bear arms. Finding the law a proper restriction of the manner of bearing arms, we affirm the conviction.

The Second Amendment states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." The Second Amendment protects an individual's right to possess and carry weapons in case of confrontation. (*District of Columbia v. Heller* (2008) 554 U.S. 570, 592, 595 (*Heller*).) The Second Amendment is fully applicable to the states by the Due Process Clause of the Fourteenth Amendment. (*McDonald v. City of Chicago* (2010) 561 U.S. 742.) While defendant failed to preserve this challenge in the trial court, we

---

[3] Section 21310 was formerly codified as section 12020, subdivision (a)(4). References in cases to section 12020 refer to section 21310.

14

reach the issue on its merits as a pure question of constitutional law. (See *People v. Yarbrough* (2008) 169 Cal.App.4th 303, 310; see also *In re Sheena K.* (2007) 40 Cal.4th 875, 884.)

We have previously adopted the intermediate level of scrutiny in reviewing the constitutionality of arms restrictions, because the statutes did not completely prohibit or unduly burden the right of law-abiding persons to bear arms, absent guidance from our Supreme Court. (*People v. Ellison* (2011) 196 Cal.App.4th 1342, 1347.) Here, too, we adopt the intermediate or heightened scrutiny standard because section 21310 does not completely prohibit or unduly burden the right of law-abiding persons to bear arms. (*Ellison*, at p. 1347.)

The law at issue in *Heller* totally banned handgun possession in the home, and required that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable. (*Heller*, *supra*, 554 U.S. at p. 628.) The *Heller* court concluded that a total ban on the possession of handguns in the home, without an exception for self-defense, was unconstitutional. (*Id.* at p. 630.) However, the Supreme Court observed that the right is not unlimited. (*Id.* at pp. 595, 626.) The "right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." (*Id.* at p. 626.) The court acknowledged the majority of 19th-century courts that have considered the question, held that prohibitions on carrying concealed weapons were lawful under the Second Amendment. (*Ibid.*) It also cautioned that its holding "should not be taken to cast doubt on longstanding prohibitions [including] the possession of firearms by felons and the mentally ill, or

laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." (*Id.* at pp. 626-627.) In so stating, the court indicated its list was not an exhaustive analysis, but merely examples of "presumptively lawful regulatory measures." (*Id.* at p. 627, fn. 26.)

The United States Supreme Court expressly included longstanding prohibitions against carrying concealed weapons in its non-exhaustive list of presumptively lawful restrictions on the right to bear arms. (*Heller*, *supra*, 554 U.S. at p. 626.) For example, carrying a concealed or concealable firearm, without a permit, in a vehicle, presents a "'threat to public order'" that may be "'"prohibited as a means of preventing physical harm to persons other than the offender." [Citation.]' [Citation.]" (*People v. Yarbrough*, *supra*, 169 Cal.App.4th at p. 314, fn. omitted.) As the court in *Yarbrough* observed, a person who carries a concealed firearm on his person or in a vehicle, which permits him immediate access to the firearm but impedes others from detecting its presence, poses an imminent threat to public safety. (*Ibid*, quoting *People v. Hodges* (1999) 70 Cal.App.4th 1348, 1357 [holding section 12025, subd. (a) does not violate substantive due process rights].)

Defendant asserts, without example, that the statute is overbroad because it criminalizes otherwise innocent conduct. He states that "on its face [it] criminalizes conduct that reaches into the home." The statute is "poorly written," and defendant urges that it be struck down. Defendant does not charge that the facts of his case

present a unique situation, or that he has been punished for otherwise innocent conduct; he objects to the broad outline of the law.

Section 21310 prohibits the carrying of a dirk or dagger that is concealed. It therefore falls within the "presumptively lawful restrictions" on the right to bear arms. The fact that the statutory definition of "dirk or dagger" may criminalize some "innocent" carrying of legal instruments such as steak knives, scissors, and metal knitting needles does not render the statute unconstitutional because "'there is no need to carry such items concealed in public.'" (*People v. Rubalcava* (2000) 23 Cal.4th 322, 330 (*Rubalcava*), quoting Sen. Com. On Crim. Procedure, Analysis of Assem. Bill No. 1222 (1995-1996 Reg. Sess.) as amended May 31, 1995, pp. 3, 5-6.) Moreover, it has been recognized that the fact a statute may capture some innocent conduct in the future does not rise to the level of a constitutional violation. (*Rubalcava*, at p. 331; *In re R.P.* (2009) 176 Cal.App.4th 562, 569.) A statute is only overbroad in the constitutional sense if it "'prohibits a "'substantial amount of constitutionally protected conduct.'"' [Citation.]" (*Rubalcava*, at p. 333, quoting *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1095.) The statute's reach into the home is not so extreme as to justify finding it constitutionally impermissible.

The California Supreme Court has previously determined that section 21310 is neither vague nor overbroad, and that holding has not been affected by *Heller* or *McDonald*. (See *Rubalcava*, *supra*, 23 Cal.4th at pp. 332-333.) Carrying a dirk or dagger in a sheath worn openly suspended from the waist is not prohibited. (§ 21310.) Carrying a concealed dirk or dagger in the home or stored in the glove compartment or

trunk of a car is not prohibited. Because the statute does not completely ban the carrying or possession of a dirk or dagger, section 21310 passes constitutional muster under the intermediate scrutiny standard of review.

The statute at issue is a limited intrusion on defendant's Second Amendment rights. We conclude section 21310, both facially and as applied to defendant, does not violate defendant's Second Amendment right to bear arms. The statute is narrowly tailored to protect the public by prohibiting only carrying a concealed dirk or dagger on one's person. Because of its narrow focus, it is not overbroad. The statute is constitutional.

D.    VAGUENESS

Defendant asserts that defining a dirk or dagger as a knife or an instrument "that is capable of ready use as a stabbing weapon" makes the statute unconstitutionally vague. Because there is good reason for the Legislature to prohibit the concealed carrying of stabbing weapons, we disagree.

For a statute to be impermissible under the Fourteenth Amendment due to vagueness, it must be found that a person of ordinary intelligence would be unable to understand what conduct was prohibited, and that the statute encouraged arbitrary and discriminatory enforcement. (*Kolender v. Lawson* (1983) 461 U.S. 352, 357-358.) Put another way, due process of law in this context requires two elements: a criminal statute must '"be definite enough to provide (1) a standard of conduct for those whose activities are proscribed and (2) a standard for police enforcement and for ascertainment of guilt."' [Citations.]" (*Williams v. Garcetti* (1993) 5 Cal.4th 561, 567.) A statute

18

must provide at least "minimal guidelines" to prevent "standardless" enforcement that allows the law to be applied by the whim or personal predilictions of the police. (*Kolender*, at p. 358.)

The presumption is for constitutionality. "Statutes must be upheld unless their unconstitutionality clearly, positively and unmistakably appears." (*Lockheed Aircraft Corp. v. Superior Court* (1946) 28 Cal.2d 481, 484; *Collins v. Riley* (1944) 24 Cal.2d 912, 915; *People v. Fannin* (2001) 91 Cal.App.4th 1399, 1403 ["the constitutionality of a statute designed to protect the public from dangerous weapons," such as slingshots or "billy" clubs, must be sustained if possible].) Useful items may function as impermissible weapons. One court used the example of a detached table leg, which is both a furniture part and a usable club. Carrying such an item "at night in a 'tough' neighborhood" could be a violation, but "the presence of suspicious circumstances attendant to possession of the proscribed object does not forge an ironclad case against defendant. He may be able to demonstrate an innocent usage of the object but the burden falls upon him to do so." (*People v. Grubb* (1966) 63 Cal.2d 614, 621, fn. omitted, superseded by statute as noted in *Rubalcava*, *supra*.)

Further, "'to succeed on a facial vagueness challenge to a legislative measure that does not threaten constitutionally protected conduct . . . a party must do more than identify some instances in which the application of the statute may be uncertain or ambiguous; he must demonstrate that "the law is impermissibly vague in all of its applications." [Citation.]' [Citations.]" (*People v. Ervin* (1997) 53 Cal.App.4th 1323, 1328, quoting *Evangelatos v. Superior Court* (1988) 44 Cal. 3d 1188, 1201.)

19

Hypothetical vagueness will not rescue defendant: "[P]laintiffs cannot complain of the vagueness of a statute if the conduct with which they are charged falls clearly within its bounds." (*Bowland v. Municipal Court* (1976) 18 Cal.3d 479, 492.)

Defendant argues that the definitional phrase "'other instrument with or without a handguard that is capable of ready use as a stabbing weapon'" both fails to give fair notice of what is forbidden and encourages erratic and arbitrary arrests and convictions. He cites a New York case concerning a prohibition on persons under age 21 carrying "'sharp pointed or edged instrument which may be used for cutting or puncturing.'" (*People v. Munoz* (1961) 9 N.Y. 2d 51, 56.) The court decided that, because the law could cover "the most commonly used and innocently possessed devices of everyday life," the purpose of the law "could only be to enable prosecution of those whom the police believe to be bad boys or girls." (*Id.* at pp. 57-58) Defendant asserts that section 21310 provides no guidance to know what items are covered by the statute, from knife and ice-pick to metal files, fountain pens, and toilet articles.

Defendant was carrying a fixed-blade knife, with a 4- and one-half-inch blade, carried in a sheath concealed inside his pants. Such items are indisputably intended to be covered by the prohibition on concealed carrying. While knives have innocent uses, they are intended to cut and stab. Defendant clearly falls within the bounds of the statute and cannot argue vagueness. (*Bowland v. Municipal Court*, *supra*, 18 Cal.3d at p. 492; *People v Murphy* (2001) 25 Cal.4th 136, 149.)

Furthermore, defendant has not explained the vagueness he finds in the statute or distinguished this claim from his earlier charge of overbreadth. His argument again

resolves into the claim that innocent conduct may be captured by the statute. *Rubalcava* settled that issue. (*Rubalcava*, *supra*, 23 Cal.4th at p. 331.) Although the law does not require a specific intent to use the item as a weapon, it does require the defendant knowingly and intentionally carry an instrument capable of ready use as a stabbing weapon concealed on his or her person. (*Id*. at pp. 331-332.) The *Rubalcava* court questioned the wisdom of the law, but affirmed its constitutionality. (*Id*. at p. 333.) We do so as well.

### E. PROSECUTORIAL MISCONDUCT

The prosecutor referred to defendant as a "three-striker" to the trial judge during sentencing. Defendant asserts that this constituted misconduct and rendered his sentence unfair. Finding no prejudice to defendant from the comment, we deny relief.

"Absent a specific Constitutional violation, prosecutorial misconduct implicates the defendant's federal constitutional rights only if it is so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process. [Citation.]" (*People v. Harris* (1989) 47 Cal.3d 1047, 1083-1084.) Short of that, only the use of deceptive or reprehensible methods to persuade the fact finder constitutes prosecutorial misconduct.

The prosecutor's comment referred to an unproven prior conviction, thus it could not be used to enhance defendant's sentence. (*People v. Rodriguez* (2004) 122 Cal.App.4th 121, 128.) Defendant asserts the mention of the unproven prior conviction must be proven harmless beyond a reasonable doubt. Alternatively, defendant argues reversal is required if a result more favorable to him was reasonably probable to have

21

been reached in the absence of the remark. (*People v. Watson* (1956) 46 Cal.2d 818, 837.) In explanation of the prejudice caused by the remark, defendant states only, "it is reasonably probable that [defendant] would not have received the high term for his offense," had the remark not been made.

The remark did not prejudice defendant at sentencing. Although it should not have been made, it added nothing of which the trial judge was not already aware. The complaint and information in the case reported three prior felony convictions, and those convictions were the subject of pretrial motions. Defendant had the option of a trial on his prior offenses, but chose to admit his priors. The court found those priors true as alleged. The court was aware defendant had a prior offense that could have been used as a second strike and that it had not been proven before him or charged in the complaint or information. After the prosecutor's comment, the trial judge inquired:

"[The Court]: Okay. What was the second strike? Another first-degree burglary; right?

"[Prosecutor]: Yes.

"[Defense counsel]: Regarding the second strike—I'm sorry—I looked at the probation report and also looked at the CLETS report and did not see a conviction for it.

"[Prosecutor]: It's not listed in the probation report but a certified prior conviction was actually marked as evidence during the trial, so the priors are there for the court to review."

The trial judge then indicated his reasons for the sentence he imposed, and each time he discussed the effect of defendant's prior serious felonies he referred to a

singular "strike." Only when he commended the People's decision not to file a second strike against defendant as "completely appropriate" did he ever mention the other strike.

The trial judge was scrupulous about separating what he knew from presiding at the trial, from what was properly a consideration at sentencing. Since the trial judge already knew about the second violent felony offense, the prosecutor's remark, however ill-considered, introduced no new material. In both its terms and the trial judge's explanation, the sentence was based upon only what was properly before the court. The trial judge did not find that defendant deserved an upper term because of a mechanical operation of prior strikes, but because defendant had a heroin addiction that made him likely to continue to commit crimes. We find no prejudice to defendant from the prosecutor's remark about defendant's additional strike offense.

F.    SENTENCING DISCRETION

Defendant charges that the trial judge abused his discretion by sentencing defendant to the upper limit on the concealed dirk or dagger violation. As there is no indication that the judge abused his discretion by considering improper or irrelevant factors, we find the sentence valid.

California Rules of Court, rule 4.420 states in pertinent part: "(a) When a sentence of imprisonment is imposed, . . . the sentencing judge must select the upper, middle, or lower term on each count for which the defendant has been convicted, as provided in section 1170(b) and these rules." The court may consider the record in the case, the probation report, evidence introduced at the sentencing hearing, and "any other

23

factor reasonably related to the sentencing decision," and "shall select the term which, in the court's discretion, best serves the interests of justice." (Cal. Rules of Court, rule 4.420(b); § 1170, subd. (b).)

Courts have broad sentencing discretion, and we review a trial court's sentencing choices, including whether to impose the upper term, for abuse of discretion. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.) In reviewing for abuse of discretion, we may not substitute our judgment for that of the trial court. (*People v. Carmony* (2004) 33 Cal.4th 367, 377.) We must affirm unless there is a clear showing the sentencing choice was arbitrary, capricious or irrational. (*People v. Avalos* (1996) 47 Cal.App.4th 1569, 1582.) A trial court abuses its discretion when it relies on circumstances that are not relevant to its decision or that otherwise constitute an improper basis for the decision. (*People v. Moberly* (2009) 176 Cal.App.4th 1191, 1196.)

A trial court is "required to specify reasons for its sentencing decision, but [is not] required to cite 'facts' that support its decision or to weigh aggravating and mitigating circumstances." (*People v. Sandoval*, *supra*, 41 Cal.4th at pp. 846-847.) "[A] trial court is free to base an upper term sentence upon any aggravating circumstance that the court deems significant, subject to specific prohibitions." (*Id*. at p. 848.) "[T]he existence of a single aggravating circumstance is legally sufficient to make the defendant eligible for the upper term." (*People v. Black* (2007) 41 Cal.4th 799, 813; see also § 1170, subd. (b); Cal. Rules of Court, rule 4.420(b).) "The court's discretion to identify aggravating circumstances is otherwise limited only by the requirement that they be 'reasonably related to the decision being made.' [Citation.]"

24

(*Sandoval*, at p. 848.) Imposition of an upper term sentence is permissible when based upon the aggravating circumstance of the defendant's criminal history. (*Black*, at p. 818.)

Defendant asserts that the trial court did not undertake a serious analysis of the sentencing factors, and only cited the probation report and the California Rules of Court. In addition, defendant charges the trial court's view that defendant's heroin addiction was the persistent root cause of his criminal behavior rendered the resulting sentence arbitrary. Defendant asserts that the court could not impose sentence based upon one aggravating factor, reference to the probation report, and the effect of defendant's intractable heroin addiction. (*People v. Fernandez* (1990) 226 Cal.App.3d 669.)

At sentencing, the trial judge first heard from both counsel. The trial court told counsel it was going to "bottom-line it" in explaining the reasons for the sentence imposed. Then, the judge discussed the probation report. Rather than reading the report into the record, the judge announced he would only talk about the factors where he disagreed; "otherwise you can assume I agree with them." The trial judge then noted he agreed the manner of the crime indicated sophistication or professionalism by defendant. The trial judge stated the crime was "pretty low-grade," but noted defendant had such a serious drug problem that "nothing[ is] going to stop him from continuing the criminality, which puts the public at risk." The probation report noted defendant had prior offenses that were numerous, or of increasing seriousness; had served prior prison terms; was on probation or parole when the crime was committed; and his prior

25

performance on probation or parole was unsatisfactory.  There were no circumstances in mitigation in the probation report, and none were offered by counsel at the sentencing hearing. The court imposed the maximum sentence based upon the aggravating circumstances of criminal sophistication, unresolved drug addiction, numerous prior convictions of increasing severity, and poor results from probation and parole.

This was well within the wide discretion a trial court has in sentencing a defendant and was not close to being an "arbitrary, capricious or patently absurd" decision.  (*People v. Jordan* (1986) 42 Cal.3d 308, 316.)  We conclude that the trial court did not abuse its discretion in sentencing defendant to the upper term.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____
                                                                    J.

We concur:

KING _____
            Acting P. J.

CODRINGTON _____
                            J.

26